IN RE MODERN BUILDING MATERIALS INC. CHAPTER 128
RECEIVERSHIP:

MARINE BANK and Robert K. Steuer, Receiver,
Plaintiffs-Respondents,

v.

TAZ'S TRUCKING INCORPORATED,
Defendant-Appellant.†

Court of Appeals

*No. 03–2827. Submitted on briefs June 14, 2004.—Decided
July 7, 2004.*

2004 WI App 164

(Also reported in 688 N.W.2d 730.)

† Petition to review granted 11-17-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael D. Jackelen* of *Steinhafel, Smith & Rowen, S.C.*, Brookfield.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Daryl L. Diesing* and *Barbara J. Janaszek* of *Whyte Hirschboeck Dudek S.C.*, Milwaukee and *Robert K. Steuer*, Milwaukee.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. ANDERSON, P.J. Taz's Trucking Incorporated claims the undisputed evidence does not rebut the common-law presumption that a consignee of a shipment is liable for freight charges. We disagree with Taz's claim because we conclude that the evidence establishes a course of conduct evidencing the intent of Modern Building Materials Inc. (MBM) and Taz's that MBM would be exclusively liable for all freight charges. Therefore, we affirm the circuit court's conclusion that Marine Bank and Robert K. Steuer are entitled to a permanent injunction barring Taz's from seeking payment of unpaid freight charges from MBM's customers-consignees.

STANDARD OF REVIEW

¶ 2. Taz's appeals from a judgment and an order which disposes of cross-motions for summary judgment. Neither Taz's nor Marine Bank and Steuer argues that there are disputed material facts that would warrant a trial. The parties have therefore effectively stipulated to the material facts. *See James Cape & Sons*

714

*Co. v. Mulcahy*, 2003 WI App 229, ¶ 3, 268 Wis. 2d 203, 672 N.W.2d 292, *review granted,* 2004 WI 20, 269 Wis. 2d 197, 675 N.W.2d 804 (Wis. Jan. 23, 2004) (No. 02–2817). We review motions for summary judgment using the same methodology as the circuit court. *M&I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.,* 195 Wis. 2d 485, 496, 536 N.W.2d 175 (Ct. App. 1995). Although summary judgment presents a question of law which we review de novo, we nonetheless value a circuit court's decision on such a question. *Id.* at 497.

### FACTS

¶ 3. We derive the key events in this summary from the parties' submissions on summary judgment. MBM manufactured and distributed precast concrete building products. In early 2002, MBM entered into a relationship with Taz's to ship MBM's products to its customers. Typically, MBM would prepare a simple document it labeled a "Bill of Lading"; unlike a uniform bill of lading,[1] it merely provided basic delivery infor-

---

[1] A uniform bill of lading is a contract between a shipper and a trucker that spells out the trucker's obligation to deliver goods to people or places.

A bill of lading is an instrument by which goods may be transferred from seller to buyer when a direct transfer is impossible and the goods must be shipped by a carrier. It describes the goods shipped, sets forth the identity of the shipper (or consignor) and the buyer (or consignee), and directs the carrier to deliver the freight to a certain location or person. A negotiable bill of lading calls for the freight to be delivered to the bearer of the bill; one who has possession of a negotiable bill of lading is deemed to have title to the shipped goods. A nonnegotiable bill of lading, in which a consignee is specified, may be considered evidence of title, but the transfer of a nonnegotiable bill of lading does not, in and of itself, transfer title to the goods under the bill.

mation: customer, delivery address, shipping date, etc. (The MBM bill of lading is reproduced in Appendix A.) MBM would contact Taz's which would pick up the shipment and the MBM bill of lading and deliver the shipment to the designated MBM customer. MBM would separately invoice its customer for each shipment; the invoice would incorporate the freight charges. Taz's and MBM had a contract regarding the rates charged for shipping; the rates were based upon the mileage between MBM and the delivery point. Customarily, Taz's would bill MBM on a weekly basis for all charges incurred during the week and MBM would remit the amount due within ninety days. Taz's did not collect freight charges from the customer.

¶ 4. In 2001, MBM entered into a business loan agreement with Marine Bank. As part of the agreement, MBM was required to deposit all funds into accounts maintained with Marine Bank and seek the bank's approval of locations where assets were stored. In January 2003, Marine Bank learned that, contrary to the terms of the business loan, MBM's majority shareholders were diverting funds to unapproved bank accounts and engaging in other conduct that impaired Marine Bank's security interest in the collateral and suggested the majority shareholders intended to avoid contractual obligations to the bank. To protect its loan to MBM, Marine Bank filed a complaint on January 22, 2003, against MBM, along with a motion for appointment of a receiver pursuant to Wis. Stat. §§ 128.08 or 813.16 (2001–02)[2] and a preliminary injunction. The

---

*Met-Al, Inc. v. Hansen Storage Co.*, 828 F. Supp. 1369, 1375 (E.D. Wis. 1993).

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

716

circuit court conducted a hearing and appointed Steuer as the Chapter 128 Receiver with all the powers listed in § 128.08. In addition, the circuit court issued an order enjoining and restraining MBM's creditors from commencing or prosecuting any other action or proceeding.[3]

¶ 5. Three days after the receiver was appointed, MBM's manager of operations met with the owner of Taz's, Sharon Pelicaric, and informed her about the receivership and that MBM would not be paying off any invoices it received from Taz's before the receivership. The next day, Pelicaric informed MBM that she was calling customers to tell them that they should pay old freight charges to Taz's; MBM also learned from various customers that Pelicaric had called them and told them that they would be invoiced for freight charges and Taz's would sue them if it was not paid directly.

¶ 6. To resolve the dispute, Marine Bank and Steuer filed a complaint on February 13, 2003, against Taz's seeking a declaratory judgment and injunction prohibiting Taz's from further attempts to collect unpaid freight charges from MBM's customers.[4] After the circuit court issued a temporary restraining order, the parties filed cross-motions for summary judgment. The circuit court granted summary judgment for Marine Bank and Steuer, permanently enjoining Taz's from collecting freight charges from MBM's customers and providing that all freight charges were to be paid to MBM or its assignee. Taz's appeals.

---

[3] On April 10, 2003, the circuit court approved the sale of MBM's inventory, equipment and personal property to a third party.

[4] Originally, Marine Bank and Steuer included a cause of action for tortious interference with a contract, but dismissed that cause of action as part of a stipulation with Taz's.

## DISCUSSION

██

¶ 7. The parties agree that the general rule of liability for freight charges is correctly set forth in *Schneider National Carriers, Inc. v. Rudolph Express Co.*, 855 F. Supp. 270, 273 (E.D. Wis. 1994):

> [There is a] common-law presumption that a consignee, the party entitled to delivery under a bill of lading, becomes liable for paying the carrier's freight charges upon delivery of the goods consigned. The same liability is presumed to attach to the consignor, the party from whom the carrier receives the goods for delivery. But liability for paying freight charges is ultimately a matter of contract, so either presumption may be rebutted by evidence that the parties to the bill of lading had something else in mind. (Citations and footnotes omitted.)

This is also the law in Wisconsin:

> The law is well established that the consignor of freight with whom the contract of shipment is made is liable to the carrier for the transportation charges unless there is an express agreement between the consignor and carrier exempting the consignor from such liability. The carrier may also look to the consignee to whom the goods are actually delivered for the payment of the freight charges. The consignor's liability rests upon the agreement of the parties arising out of the transactions between them.

*Great N. Ry. Co. v. Hocking Valley Fire Clay Co.*, 166 Wis. 465, 469, 166 N.W. 41 (1918).

¶ 8. The parties disagree about the circuit court's conclusion that Marine Bank and Steuer overcame the presumption of MBM's customers' liability for freight charges by showing a course of conduct between MBM

and Taz's that made MBM solely liable for all freight charges. While acknowledging that *Schneider National* is an accurate statement of the law, Taz's asserts that there are significant differences between that case and this appeal that dictate a different result.

¶ 9. In *Schneider National*, the federal district court granted the consignees' cross-motion for summary judgment, dismissing Schneider National's action seeking to recover freight charges from the consignees. *Schneider Nat'l*, 855 F. Supp. at 271. In the early 1980s, St. Johnsbury Trucking, an interstate trucking company operating primarily on the east coast, entered into interchange agreements with the three trucking companies—Rudolph Express Company, Inc., Northwest Transport Service, Inc., and Wren, Inc.—which were the defendants in *Schneider National*. *Id.* Under the agreements, known as the "Sunpath" service, St. Johnsbury would collect small shipments in its eastern distribution terminals, combine them into full shipments and transport them to the defendants' distribution terminals. *Id.* The defendants separated each shipment into the smaller components and transported the small shipments to final destinations. *Id.*

¶ 10. Originally, the Sunpath shipments were transported by rail, but in 1987, Schneider National was the successful bidder after St. Johnsbury switched from rail to trucking. *Id.* Schneider National and St. Johnsbury established written rates for shipping the Sunpath shipments from St. Johnsbury's eastern terminals to the defendants' terminals and orally agreed that Schneider National would bill St. Johnsbury after each delivery. *Id.* at 271–72. The defendants were not a party to the contract between Schneider National and St. Johnsbury and, while not a party to the Sunpath

719

service, Schneider National had a thorough understanding of the agreements between St. Johnsbury and the defendants. *Id.* at 272.

¶ 11. For each shipment, St. Johnsbury would prepare a one-page document entitled "Sunpath Bill of Lading," which listed the location of the St. Johnsbury terminal and the name of the defendant—designated as consignee—and the location of the terminal designated for delivery and a date and time of departure from the St. Johnsbury terminal. *Id.* When a driver for Schneider National picked up a load, he or she would sign this document; one copy would be left at the St. Johnsbury terminal and the other three copies accompanied the shipment. *Id.* When the shipment was delivered, one copy was left at the defendants' terminal, one copy was the Schneider National driver's receipt and one copy was returned with an invoice to St. Johnsbury. *Id.*

¶ 12. Approximately a week after delivery, Schneider National would submit the fourth copy of the "Sunpath Bill of Lading" and an invoice to St. Johnsbury. *Id.* For about six years, St. Johnsbury routinely paid the invoices submitted by Schneider National, but in March 1993, St. Johnsbury stopped making payments. Nonetheless, Schneider National continued to make Sunpath deliveries until mid-June 1993. *Id.* A week after St. Johnsbury filed for bankruptcy, Schneider National contacted each of the defendants demanding payments for a dozen Sunpath shipments. *Id.* When the defendants refused to pay, Schneider National started a collection action. *See id.*

¶ 13. The federal district court rejected Schneider National's argument that because it was not a party to the interchange agreements between St. Johnsbury and the defendants, the agreements could not limit its

common-law right to collect freight charges from the defendants. *Id.* at 273. The court held that the defendants had overcome the common-law presumption of consignee liability with evidence that the parties—Schneider National and St. Johnsbury—through the "Sunpath Bill of Lading" had agreed that St. Johnsbury would be solely liable for all freight charges. *Id.* at 274–75. The federal court compared the "Sunpath Bill of Lading" to a traditional bill of lading and concluded that the course of dealing between Schneider National and St. Johnsbury established a course of conduct requiring Schneider National to look exclusively to St. Johnsbury for payment of the freight charges. *Id.*

¶ 14. Taz's attempts to distinguish this case from *Schneider National* on the facts. First, Taz's points out that all of the parties in *Schneider National* were trucking companies and the business relationship was not the traditional consignor, freight carrier and consignee; but in this case, the traditional relationship is present. We are not persuaded that the business identity of the parties is of any importance; the federal district court made no mention of a lack of a traditional business relationship between the trucking companies. In fact, the federal district court set out the general common-law rule and would have applied it but for the evidence overcoming the common-law presumption.

¶ 15. Taz's points out that the Sunpath service agreements predated the involvement of Schneider National by seven years and Schneider National shipped between St. Johnsbury and the defendants for an additional six years, whereas the relationship between Taz's and MBM lasted for less than a year. Again, we are not persuaded that this factual difference is significant because the federal district court focused on

721

the way Schneider National and St. Johnsbury did business, not on how long they did business.

¶ 16. Taz's argues that the "MBM Bill of Lading," unlike the "Sunpath Bill of Lading," was intended to be a traditional bill of lading. Taz's acknowledges that the "MBM Bill of Lading" does not contain much of the language that is found in a traditional bill of lading, but asserts that there are significant differences that separate it from the "Sunpath Bill of Lading." First, the "MBM Bill of Lading" has two provisions with respect to liability for damaged goods. Second, the "MBM Bill of Lading" does not indicate that Taz's is to return the document with an invoice to MBM. Third, the "MBM Bill of Lading" contained no language that advised the customers that the freight charges were the sole responsibility of MBM.

█

¶ 17. Contrary to Taz's argument, the "MBM Bill of Lading" is not that different from the "Sunpath Bill of Lading" and is not the equivalent of a traditional bill of lading. In *Schneider National*, the court described the standard bill of lading used in the trucking industry as containing two full pages of very small print to set forth the parties' obligations. *Id.* at 274. The court explained that the standard bill of lading serves both as a receipt and a contract of carriage and

> names the contracting parties, specifies the rate or charge for transportation, and sets forth the agreement and stipulations with respect to the limitations of the carrier's common-law liability in the case of loss or injury to the goods and other obligations assumed by the parties or matters agreed upon between them.

*Id.* Finally, the standard bill of lading also serves as title to the goods being shipped and is forwarded separately

to the consignees who must present it to the trucking company to establish the right to receive the goods. *Id.*

¶ 18. In contrast, the "MBM Bill of Lading" is a one-page document without a lot of fine print. It does not set forth the name of the trucking company and the freight charges. It does not limit Taz's common-law liability in case of loss or injury to the goods. Further, it is not a document of title and it is not forwarded separately to MBM's customers to use to establish a right to the goods on Taz's trucks.

¶ 19. There are two decisions which apply the common-law presumption on consignee liability for freight charges in the traditional arrangement of consignor, trucking company and consignee. First, in *E.W. Wylie Corp. v. Menard, Inc.*, 523 N.W.2d 395, 404 (N.D. 1994), the North Dakota Supreme Court found *Schneider National* to be particularly helpful in resolving the issue of consignee liability. In *Wylie*, Menard purchased a large quantity of lumber from a lumber mill in New York and, as part of the contract, Menard was to pay all freight charges directly to the mill. *Wylie*, 523 N.W.2d at 397. The bill of lading did not indicate the amount of freight charges or who was liable for them. *Id.* Wylie was the freight carrier and billed the mill for the freight charges after delivery of seven loads; it was never paid before the mill ceased operations. *Id.* In holding that the conduct of the parties overcame the common-law presumption of consignee secondary liability for freight charges, the North Dakota Supreme Court reasoned:

> We believe the circumstances of this case evidence an arrangement establishing IKA's [the consignor's] exclusive liability for freight charges. Although Wylie was not a party to Menard's agreement with IKA, IKA directed Wylie to bill it for transportation costs in a

manner that conformed to the agreement between IKA and Menard. During their entire business relationship, Wylie looked solely to IKA for payment and billed it for freight charges after each delivery. Even though freight charges were more than 30 days past due on several of the shipments, Wylie did not contact Menard in regard to payment until IKA informed Wylie that it was unable to make any payments. The bills of lading were silent as to the liability for and the amount of freight charges, and they thus confirmed Menard's understanding that payment of freight charges was not a matter for its concern, but was a matter of contract between IKA and Wylie. These facts do not support an implied agreement that Menard would be liable to Wylie for the freight charges. Rather, we conclude that any common law presumption is satisfactorily rebutted because the circumstances evidence an intention on the part of Wylie and the other parties to the arrangement that Wylie would look exclusively to IKA for payment of the freight charges. Accordingly, we affirm the judgment denying Wylie's complaint.

*Id.* at 405–06 (citations omitted).

¶ 20. The second case is *LTV Steel Co., Inc. v. David Graham Co.*, 78 B.R. 713, 715 (Bankr. S.D.N.Y. 1987); it involves a freight carrier that attempted to bill consignees for previously delivered "prepaid" shipments after the consignor filed for bankruptcy. While much of the decision in *LTV Steel* dealt with the Interstate Commerce Act, *id.* at 717–22, the bankruptcy court also addressed the common-law right to collect freight charges from a consignee. *Id.* at 722–25. The bankruptcy court stated the general rule—that a freight carrier could seek payment of freight charges from either the consignor or consignee—did "not apply if the parties agree to reallocate liability" and that such an agreement can be evidenced by the conduct of the parties. *See id.* at 723.

724

¶ 21. The bankruptcy court provided ten factors that a court could look to in deciding whether "the parties had agreed that the consignor would be exclusively liable for the shipping charges." *Id.* at 723–24 (emphasis omitted). Those factors and their application to undisputed facts in this appeal are:

1. "The carrier historically looked solely to the consignor for payment." *See id.* at 723. Until MBM went into WIS. STAT. ch. 128 receivership, Taz's billed MBM weekly for all freight charges incurred. Even though freight charges were not paid for ninety days, Taz's never contacted consignees for payment.

2. "This was the understanding of the parties as evidenced by every facet of their business relationship." *See id.* at 723–24. There is no evidence that Taz's and MBM contemplated any other method of payment for freight charges.

3. "The consignor alone contracted with the carrier for shipping services." *See id.* at 724. When MBM had a shipment ready for delivery, it would contact Taz's or another trucking company to arrange delivery.

4. "Direct billing was effected from carrier to consignor, and direct billing took place after delivery." *See id.* Taz's billed MBM directly every week for all freight charges incurred that week. The freight charges were based upon a mileage rate the parties had negotiated at the beginning of their relationship.

5. "The consignor paid freight charges from its general funds." *See id.* There is no evidence of this factor.

6. "Customer-consignees were billed by the consignors on a unitary basis (i.e. one net amount for delivered materials inclusive of freight) and they paid this single amount directly to the consignor." *See id.* MBM had separate contracts with its customers and would bill them directly. The invoiced amount incorporated all of MBM's costs of doing business, including freight charges, and the customers would pay the invoiced amount directly to MBM.

7. "The consignor deposited the sum received from the customer-consignees into its general accounts." *See id.* There is no evidence of this factor.

8. "There was no request by, or agreement with, the carrier to segregate any portion of the funds received from customer-consignees, and none took place." *See id.* There is no evidence of this factor.

9. "The two billing processes [i.e. (freight company) to (consignor) and (consignor) to consignee] were not synchronized so as to give an impression that the [consignor was a] mere conduit between carrier and consignee." *See id.* Taz's billed MBM weekly for all shipments made during the week and not on a per-shipment basis and there is no evidence on the cycle MBM used to bill its customers. Taz' weekly billing of MBM does not support a conclusion that MBM was collecting freight charges on Taz's behalf.

10. "Bills of lading and delivery tickets were marked 'prepaid' to indicate consignor's liability, and were signed by the carrier's agents without objection." *See id.* The "MBM Bills of Lading" were not marked "prepaid." Similarly, the "MBM

726

Bills of Lading" did not contain the freight charges; consequently, a consignee had no way of knowing if it would be liable for freight charges.

██

¶ 22. While there is no law in Wisconsin directly on point, we are satisfied that *LTV Steel* and *Schneider National* are correct statements of the law and we choose to apply them to the facts in this case. *Streff v. Town of Delafield*, 190 Wis. 2d 348, 356–57, 526 N.W.2d 822 (Ct. App. 1994) (We may adopt federal court decisions we find persuasive.). Under these two cases, the evidence proves a course of conduct between MBM and Taz's establishing MBM's exclusive liability for freight charges, which overcomes the common-law presumption of consignee liability.

¶ 23. Taz's raises a second issue on appeal. It asserts that MBM made false representations to its owner, Pelicaric, before seeking receivership protection and asks us to apply the doctrine of equitable estoppel to bar Marine Bank and Steuer from arguing that the course of conduct between Taz's and MBM rebutted the common-law presumption. Taz's concedes that it did not specifically raise the equitable estoppel legal argument in the circuit court, but entreats us to address equitable estoppel because it is an issue of law.

¶ 24. "It is the often-repeated rule in this State that issues not raised or considered in the trial court will not be considered for the first time on appeal." *Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140 (1980), *superseded on other grounds by* WIS. STAT. § 895.52. Marine Bank and Steuer point out that if this issue had been raised in the court below, they would have presented affidavits to refute the evidence Taz's

believes supports its arguments. As the Wisconsin Supreme Court has noted, to address the issue under such circumstances would work an injustice because Marine Bank and Steuer have not had a chance to meet Taz's evidence. *Cappon v. O'Day*, 165 Wis. 486, 490–91, 162 N.W. 655 (1917). Therefore, we decline to address the second issue presented by Taz's.

### CONCLUSION

¶ 25. The common-law presumption that a trucking company can look to a consignee of a shipment for payment of freight charges has been rebutted in this case by undisputed evidence that MBM and Taz's had agreed MBM would be solely liable for all freight charges. Therefore, we affirm the circuit court's issuance of a permanent injunction barring Taz's from seeking payment of freight charges from any customer-consignee of MBM.

*By the Court.*—Judgment and order affirmed.

# APPENDIX A

**BILL OF LADING**

:: 28152 .

MODERN
BUILDING MATERIALS, INC.
8011 GREEN BAY ROAD
KENOSHA, WI 53142
Ph. #: 262/691-3166

SOLD TO: _____
_____
_____

SHIP DATE: _____/_____/_____
CUSTOMER JOB #: _____
P.O # _____

SHIP TO: _____
_____
_____

We are not responsible for material after unloaded Claims for shortages
or errors must be made on receipt of goods, or they will not be allowed.
If goods are damaged or broken be sure to mark delivery receipt.

RECEIVED BY

| ADJ. RINGS | | MISC. |
|---|---|---|
| _____ Ea. / Bndl. / Plt. _____ | | |
| _____ Ea. / Bndl. / Plt. _____ | | |
| _____ Ea. / Bndl. / Plt. _____ | | |
| _____ Ea / Bndl. / Plt. _____ | | |

| STM | SAN | WATER | | | BTM | BEN | F. TOP | DROP | BOOTS | PLANT | MISC. | ACCOUNTING |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MH | CB | INL | VV | PT | DATE: | | TOTAL HGT. | | | WET POUR | | |
| # | | | | | | | | | ◯ | CORING | | |
| PS | 24 | TURMAC | | | | | | | | BY | | |
| NS | 28 | STEIRO | | | | | | | | | | |
| STM | SAN | WATER | | | BTM | BEN | F. TOP | DROP | BOOTS | PLANT | MISC | ACCOUNTING |
| MH | CB | INL | VV | PT | DATE: | | TOTAL HGT. | | | WET POUR | | |
| # | | | | | | | | | ◯ | CORING | | |
| PS | 24 | TURMAC | | | | | | | | BY | | |
| NS | 26 | STEIRO | | | | | | | | | | |
| STM | SAN | WATER | | | BTM | BEN | F. TOP | DROP | BOOTS | PLANT | . MISC. | ACCOUNTING |
| MH | CB | INL | VV | PT | DATE: | | TOTAL HGT. | | | WET POUR | | |
| # | | | | | | | | | ◯ | CORING | | |
| PS | 24 | TURMAC | | | | | | | | BY | | |
| NS | 26 | STEIRO | | | | | | | | | | |
| STM | SAN | WATER | | | BTM | BEN | F. TOP | DROP | BOOTS | PLANT | MISC. | ACCOUNTING |
| MH | CB | INL | VV | PT | DATE: | | TOTAL HGT. | | | WET POUR | | |
| # | | | | | | | | | ◯ | CORING | | |
| PS | 24 | TURMAC | | | | | | | | BY | | |
| NS | 28 | STEIRO | | | | | | | | | | |

Supplier certifies that the above material(s) has been loaded from stock material which has
been tested, approved and released for shipment by the Illinois Department of Transportation.

Subtotal: _____

Tax _____

_____ _____
Signature of Supplier Representative Date

County Tax: _____

We are not responsible for material after unloaded. Claims for shortages or errors must be made
on receipt of goods, or they will not be allowed. If goods are damaged or broken be sure to mark
delivery receipt.
Received By:

Supplier certifies that the above material(s) has been loaded from stock
material which has been tested, approved and released for shipment by the
Illinois Dept. of Transportation

Signature of Supplier Representative

Total _____

DISPATCH _____
LOADER _____
DRIVER _____

1 1/4" EZ Stick _____ Boxes

729