IN RE MODERN BUILDING MATERIALS INC.
CHAPTER 128 RECEIVERSHIP:

MARINE BANK and Robert K. Steuer, Receiver,
Plaintiffs-Respondents,

v.

TAZ'S TRUCKING INCORPORATED,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2003AP2827. Oral argument March 31, 2005.
—Decided June 2, 2005.*

2005 WI 65

(Also reported in 697 N.W.2d 90.)

For the defendant-appellant-petitioner there were briefs by *Mark S. Schmitt* and *Maier McIlnay Schmitt & Button, Ltd.,* Grafton, and oral argument by *Mark S. Schmitt.*

For the plaintiffs-respondents there was a brief by *Daryl L. Diesing, Barbara J. Janaszek* and *Whyte Hirschboeck Dudek S.C.,* Milwaukee, and *Robert K. Steuer* and *Robert K. Steuer Law Office,* Milwaukee, and oral argument by *Robert K. Steuer* and *Barbara J. Janaszek.*

¶ 1. N. PATRICK CROOKS, J.  Petitioner Taz's Trucking Incorporated (Taz's) petitions for review of a published decision of the court of appeals, *Marine Bank v. Taz's Trucking Inc.,* 2004 WI App 164, 275 Wis. 2d 711, 688 N.W.2d 730, affirming the circuit court's grant

of summary judgment in favor of Marine Bank and Robert K. Steuer, Receiver (Marine Bank). Marine Bank seeks to enjoin Taz's from collecting unpaid freight charges from the consignees of Modern Building Materials Inc. (MBM). On review, we address the following questions: (1) whether there are genuine issues of material fact, or reasonable alternative inferences to be drawn from undisputed facts, so that summary judgment should not have been granted; and (2) what are the applicable legal principles when determining whether Taz's may collect freight charges from the consignees-customers of MBM?

¶ 2. We conclude that summary judgment was improperly granted to Marine Bank. Genuine issues of material fact, and reasonable alternative inferences drawn from undisputed facts, exist as to whether an agreement was made between Taz's and MBM, to the effect that Taz's could not seek payment from a consignee-customer of MBM. We further conclude that Taz's liability for payment of freight charges is governed by contract law, and that there exist common law presumptions that a consignee and a consignor may be liable for the payment of those freight charges. *See Schneider Nat'l Carriers, Inc. v. Rudolph Express Co.*, 855 F. Supp. 270, 273 (E.D. Wis. 1994). These presumptions may be rebutted, however, by evidence that the carrier and the consignor agreed that the consignor would be liable, exclusively, for such charges. Absent an express contract to that effect, such an agreement may be determined to exist through analysis of the conduct of the parties. *Id.* Here, however, the record is insufficient for a determination as to whether there was such an agreement. For these reasons, we reverse the court of appeals' decision affirming the summary judgment

278

granted by the circuit court and remand this case for further proceedings consistent with this opinion.

I

¶ 3.  In the spring of 2002, MBM entered into a business relationship with Taz's to ship its precast concrete building products to MBM's customers. The parties entered into a written agreement regarding the rates charged for shipping, but that agreement did not cover whether the consignor (MBM) or the consignee (MBM's customer) would be liable for those charges.

¶ 4.  A typical transaction, pursuant to this agreement, consisted of MBM contacting Taz's to pick up the shipment and deliver the goods to an MBM customer. Taz's would subsequently calculate the trucking charge based upon prespecified rate sheets. For each shipment, MBM prepared a bill of lading to accompany the goods. This bill of lading served as the key transmittal document for each shipment to an MBM customer. The document did not contain any terms assigning liability for the freight charges; it simply provided the basic delivery information, such as time, place, manner, and the identity of the consignee.

¶ 5.  Taz's billed MBM each week for the previous week's deliveries, until Taz's factored the account with a financing company in July 2002. Taz's informed MBM of this arrangement and indicated that MBM could wait up to 90 days before making its payments to the factor.[1] However, in September 2002, MBM stopped making payments. When the factor informed Taz's of MBM's delinquency in November 2002, Taz's immediately con-

---

[1] A factor is defined as "[o]ne who buys accounts receivable at a discount. . . ." *Black's Law Dictionary* 612 (7th ed. 1999).

tacted MBM and threatened to seek the past-due freight charges from the consignees. MBM promised to pay, and Taz's agreed not to seek payment from MBM's customers-consignees.

¶ 6. By January 2003, MBM was insolvent. Marine Bank, which made loans to MBM in 2001–02 totaling over $9 million, filed a complaint and a motion for appointment of a receiver and for a preliminary injunction. On January 24, 2003, the Kenosha County Circuit Court, Michael S. Fisher, Judge, granted Marine Bank's motion and appointed Robert K. Steuer (Steuer) as receiver of MBM, pursuant to Wis. Stat. ch. 128 (2001–02).[2]

¶ 7. MBM then informed Taz's that it was forced into receivership and that it would not pay for freight charges that accrued prior to the receivership on January 24, 2003. Taz's then demanded payment from the consignees. Several of the consignees informed the receiver, Steuer, that Taz's demanded payment from them for the freight charges.[3] Marine Bank filed a complaint on February 13, 2003, seeking an injunction and a declaratory judgment preventing Taz's from collecting freight charges from the consignees. The circuit court issued a temporary restraining order against Taz's to that effect.

---

[2] Unless otherwise indicated all references to the Wisconsin Statutes are to the 2001–02 edition.

[3] The parties entered into a stipulation pending the disposition of the case. The stipulation provided that Marine Bank was free to collect from MBM's customers-consignees any and all of MBM's accounts receivable. For each account receivable recovered, Marine would hold in trust in an interest-bearing business account the lesser of the dollar amount claimed by Taz's with respect to the account receivable or the amount actually collected on the account receivable from the identified MBM customer-consignee.

¶ 8. Both sides then filed motions for summary judgment. The circuit court granted Marine Bank's motion and permanently enjoined Taz's from collecting from the consignees. The court concluded that there were no genuine issues of material fact. The court acknowledged the presumption of consignee liability upon receipt of the goods, but held that the presumption was overcome here with evidence that MBM and Taz's had impliedly agreed that MBM would be liable for all freight charges. Taz's timely appealed.

¶ 9. The court of appeals affirmed the circuit court's grant of summary judgment. It agreed with the circuit court that the law creates a presumption that both the consignor and consignee are liable to the carrier for freight charges. The court held:

> [There is a] common-law presumption that a consignee, the party entitled to delivery under a bill of lading, becomes liable for paying the carrier's freight charges upon delivery of the goods consigned. The same liability is presumed to attach to the consignor, the party from whom the carrier receives the goods for delivery. But liability for paying freight charges is ultimately a matter of contract, so either presumption may be rebutted by evidence that the parties to the bill of lading had something else in mind.

*Marine Bank*, 275 Wis. 2d 711, ¶ 7 (quoting *Schneider National*, 855 F. Supp. at 273). Relying on *Schneider National*, the court of appeals determined that the common law presumption in regard to consignee liability had been rebutted here by undisputed evidence that MBM and Taz's had agreed that MBM would be solely liable for freight charges.[4]

---

[4] The court also looked at *E.W. Wylie Corporation v. Menard, Inc.*, 523 N.W.2d 395 (N.D. 1994), and *LTV Steel Co. v.*

281

¶ 10. Taz's filed a petition for review with this court. We granted its petition on November 17, 2004.

## II

■ ¶ 11. The first issue that we address is whether the circuit court properly granted Marine Bank's motion for summary judgment. We review the grant of summary judgment de novo, applying the same methodology as the circuit court and the court of appeals, and benefiting from the analyses of those courts. *Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 11, 277 Wis. 2d 303, 691 N.W.2d 334 (citing *Yahnke v. Carson*, 2000 WI 74, ¶ 10, 236 Wis. 2d 257, 613 N.W.2d 102). Wisconsin Stat. § 802.08(2) directs that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

■ ¶ 12. Our methodology begins by determining if a claim for relief is set forth. If so, and the moving party has established a prima facie case for summary judgment, "we examine the record to determine whether there 'exist[s] disputed material facts, or undisputed material facts from which reasonable alternative infer-

*David Graham Co.*, 78 B.R. 713 (Bankr. S.D.N.Y. 1987), in addition to *Schneider National Carriers, Inc. v. Rudolph Express Co.*, 855 F. Supp. 270, 273 (E.D. Wis. 1994), and determined that all three cases are correct statements of law and should be applied to the facts in this case. *See Marine Bank v. Taz's Trucking, Inc.*, 2004 WI App 164, ¶¶ 19–22, 275 Wis. 2d 711, 688 N.W.2d 730.

282

ences may be drawn, sufficient to entitle the opposing party to a trial.' " *Trinity Evangelical v. Tower Ins. Co.,* 2003 WI 46, ¶ 32, 261 Wis. 2d 333, 661 N.W.2d 789 (quoting *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980)). "The burden is on the moving party to prove that there are no genuine issues of material fact. An issue of fact is genuine if a reasonable jury could find for the nonmoving party. A material fact is such fact that would influence the outcome of the controversy." *Central Corp. v. Research Prods. Corp.,* 2004 WI 76, ¶ 19, 272 Wis. 2d 561, 681 N.W.2d 178 (citations omitted).

¶ 13.   We conclude, based on our review of the record, that there are disputed material facts, and reasonable inferences to be drawn from undisputed facts, to preclude summary judgment.[5] The primary issue in this case is whether there was an agreement between MBM and Taz's regarding the assignment of liability for freight charges, so that Taz's could not seek payment from a consignee. Although there is no evidence of an express written agreement on this question, the circuit court and court of appeals held that the parties' course of conduct established an agreement that MBM would be exclusively liable for the freight charges. It must be noted that while the course of dealing between MBM and Taz's supports the conclusion that Taz's or its factor generally received payment from MBM, there is nothing in the record that leads us

---

[5] Although both parties argued in their briefs that the facts were undisputed, they asserted otherwise at oral argument. Taz's responded during questioning that there was no agreement on the facts, and Marine Bank's counsel stated that the parties were "two ships passing in the night with respect to what the facts are."

to the conclusion directly, or by implication, that there was an agreement that MBM would be liable, exclusively, for such charges, and that Taz's could not seek payment from a consignee-customer of MBM. Under these circumstances, summary judgment should not have been granted.

¶ 14.  Although there may be other genuine issues of material fact˚ or reasonable alternative inferences drawn from undisputed facts, the lack of clear, undisputed evidence in the record concerning exclusivity justifies the reversal of the grant of summary judgment.

## III

¶ 15.  We next address the legal principles applicable in determining whether Taz's may collect from the consignees-customers of MBM. According to Taz's, the court of appeals erred by relying on *Schneider National, E.W. Wylie Corporation v. Menard Inc.*, 523 N.W.2d 395 (N.D. 1994), and *LTV Steel Co. v. David Graham Co.*, 78 B.R. 713 (Bankr. S.D.N.Y. 1987), to set forth the general rule of liability for such charges.[6] Taz's asks us to rely instead on cases decided by this court, which it claims adhere to the rule that, unless there is an express agreement otherwise, the consignee will become liable to the carrier for freight charges upon the acceptance of delivery. *See Chicago & N.W. Transp. Co. v. Krohn Cartage Co.*, 79 Wis. 2d 39, 255 N.W.2d 310 (1977); *Werner Transp. Co. v. Shimon*, 249 Wis. 87, 23 N.W.2d 519 (1946); *Waters v. Pfister & Vogel Leather Co.*, 176 Wis. 16, 186 N.W. 173 (1922).

---

[6] Although the court of appeals acknowledged that "[t]he parties agree that the general rule of liability for freight charges is correctly set forth in *Schneider*," *Marine Bank*, 275 Wis. 2d 711, ¶ 7 (citation omitted), Taz's apparently withdrew its endorsement of that rule before this court.

¶ 16. For guidance, we review many of the cases and the rationale discussed by the parties, the circuit court, and by the court of appeals. The first case on consignee liability is *Waters*. There, a carrier delivered goods to a consignee, and the bill of lading[7] used by the parties was marked "prepaid." Although the document did not contain the freight charges or amount collected, the court determined that the carrier may look to recover the freight charges from the consignee, to whom the goods were actually delivered. Relying on the Interstate Commerce Act (ICA),[8] the court held that "[i]t is the acceptance of the goods . . . that makes the consignee a party to the contract. Having accepted the

---

[7] When a carrier signs a bill of lading upon receiving goods for delivery, the bill of lading may serve as a contract as well as a receipt. *See Schneider Nat'l,* 855 F. Supp at 273–74. Therefore, its provisions are to be reviewed in order to determine whether it was intended to be a contract of carriage and, if so, what was the agreement of the parties.

[8] The Interstate Commerce Act (ICA), passed by Congress in 1887, created the Interstate Commerce Commission, the first regulatory agency. Congress enacted the ICA in order to regulate the railroad industry, and to solve the problems of widespread discrimination that existed in pricing. The historical purpose of the ICA was "to achieve uniformity in freight transportation charges, and thereby to eliminate the discrimination and favoritism that had plagued the railroad industry in the late 19th century." *S. Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 344 (1982). The ICA required common carriers to publish their rates in tariffs filed with the ICC, and prohibited carriers from charging or receiving different compensation for transportation than the rate specified in the tariff.

Although the ICA was repealed by the ICC Termination Act of 1995, Pub. L. No. 194–88, 109 Stat. 803 (1995), the new statutory framework has retained some of the provisions. *See* 49 U.S.C. § 13707.

goods, and it being undisputed that only a part of the lawful charge has been paid, the defendant thereby became liable for the remainder." *Waters,* 176 Wis. at 20.

¶ 17.   In *Werner,* a carrier filed suit against a consignee to recover freight charges for the delivery of three loads of eggs. The bill of lading attached to the shipment bore the notation "collect." This court held that "[a]lthough no contractual relation arises between carrier and consignee by the mere designation of the latter as consignee, the consignee is the presumptive owner of the goods transported[,] and if he accepts the goods in the capacity of owner the law implies a promise on his part to pay the charges." *Werner,* 249 Wis. at 89 (citation omitted).

¶ 18.   Finally, in *Krohn,* this court gave its most recent interpretation on consignee liability for freight charges. Like the cases listed above, a carrier brought an action against a consignee to recover freight charges for two different shipments. Krohn Cartage was named as the consignee in both shipments, and the record indicated that only a small portion of the order was delivered to it. The court held:

> "The mere designation in the bill of lading of the consignee as the one liable for the freight charges does not create a contractual relationship between the carrier and the consignee, rendering the latter liable therefor, but rather, the consignee becomes liable therefor when an obligation arises on his part from presumptive ownership, acceptance of goods and the services rendered, and the benefits conferred by the carrier for such charges."

*Krohn,* 79 Wis. 2d at 45 (quoting *Arizona Feeds v. S. Pacific Transp. Co.,* 519 P.2d 199, 206 (Ariz. Ct. App. 1974).

¶ 19.  We recognize that these cases were based, to some extent, on strict interpretations of the ICA. *See New York Cent. & Hudson River R.R. Co. v. York & Whitney Co.*, 256 U.S. 496 (1921); *Pittsburg, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink*, 250 U.S. 577 (1919). These cases appear to present a rule that, at least under the ICA, a consignee/beneficial owner of shipped goods will always be jointly and severally liable for a carrier's freight charges upon acceptance of those goods. *In re Penn-Dixie Steel Corp.*, 6 B.R. 817, 820 (Bankr. S.D.N.Y. 1980).

¶ 20.  The court of appeals cites a line of cases that rely on contract principles to determine the liability for freight charges, but which also recognize the presumptions concerning a determination as to whether the consignor and consignee both may be liable for such charges. In *Schneider National*, a carrier sought to recover freight charges from consignees. Pursuant to its agreement with the consignor, Schneider's drivers would pick up the shipments from one of the consignor's terminals and sign a document entitled "Sunpath Bill of Lading," "which listed the location of the [consignor's] terminal, the name and location of one of the instant defendants—identified as 'consignee'—various reference numbers, and the date and time of the driver's departure." *Schneider Nat'l*, 855 F. Supp. at 272. Upon delivery, the consignee would inspect the trailer, indicate on the document whether the shipment was "intact," and sign the document on the line marked "consignee." Schneider would then submit this document, along with an invoice, to the consignor. The consignor regularly paid Schneider's invoices, and Schneider never requested payment of freight charges from any consignee. This was consistent with the agreement between the consignor and the consignee,

287

making the consignor responsible for transporting the shipments.[9] *Id.* After the consignor stopped paying the freight charges and filed for bankruptcy, Schneider attempted collection from the consignees.

¶ 21. Schneider's claim was based on the "presumption that a consignee, the party entitled to delivery under a bill of lading, becomes liable for paying the carrier's freight charges upon delivery of the goods consigned." *Id.* at 273. However, the court in *Schneider National* made clear that the same liability is presumed to attach to the consignor. As a result, the court concluded that "liability for paying freight charges is ultimately a matter of contract, so either presumption may be rebutted by evidence that the parties to the bill of lading had something else in mind." *Id.* (citing *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343 (1982); *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 67 (1924); *Consol. Freightways Corp. of Del. v. Admiral Corp.*, 442 F.2d 56, 62 (7th Cir. 1971)).

¶ 22. When the court in *Schneider National* looked for other evidence of the parties' intent, it focused on the Sunpath Bill of Lading. It held that the omission of terms from that bill of lading, such as the rate or charge for transportation, the agreement and stipulations with respect to the carrier's common law liability in the case of loss or injury to the goods, and other obligations assumed by the parties, suggested

---

[9] Taz's argues that the *Schneider National* case is distinguishable, because in that case there existed a contract between the consignor and the trucking company regarding payment of freight charges. Taz's also points out that the course of dealing in *Schneider National* went on for six years, where here the practice between MBM and Taz's lasted for months, not years. That difference is an appropriate factor for consideration.

that these bills of lading were not intended to function as contracts of carriage.[10] *Id.* at 274. Thus, the court held that "[t]he obvious implication is that freight charges were to be assessed not on the basis of the bill itself, but on the basis of an invoice sent separately from Schneider to [the consignor], pursuant (necessarily) to a contract between the two." *Id.*

¶ 23. The court also looked to the way in which the bills of lading were used to indicate the intent of the parties. In that case, the Sunpath Bills of Lading were not forwarded to the consignees separately from the shipments. *Id.* Instead, the bill of lading was given to a consignee upon delivery of the shipment. The court specifically held that the "Sunpath bills thus cannot have served as 'documents of title' establishing defendants' right to receive the shipments. . . ." *Id.* (citation omitted). "[B]ecause [the consignees] did not receive the bills prior to arrival of Schneider's deliveries, [the

---

[10] The court contrasted the Sunpath Bill of Lading from the Uniform Bill of Lading, 49 C.F.R. § 1051.1. The court found, among other things, that because the Sunpath Bill of Lading did not contain the terms required by the Uniform Bill of Lading, the parties did not intend to convey liability for payment of freight charges in that document.

While we recognize that 49 C.F.R. § 1051.1 has been redesignated as 49 C.F.R. § 373.101, the analysis listed above is still relevant. The fact that the regulatory provision has been redesignated does not change the fact that the Sunpath Bill of Lading was not a contract of carriage and did not contain any language that might indicate a right of the carrier to collect payment of freight charges from the consignee. Without such language, it was merely an invoice. We see no reason for a court not to use such a document as a factor in analyzing the parties' course of conduct, in order to determine whether there was any agreement that the consignor would be exclusively liable for the freight charges.

289

consignees] were deprived of any meaningful opportunity to decide whether to reject them, as is the consignee's right when the bill fails to conform to the underlying contract of sale or shipment." *Id.* (citation omitted). Accordingly, based on the terms of the Sunpath Bill of Lading, and the contents and use of those bills, the court held that the bills "expressed an intention on the part of Schneider and the other parties that Schneider would look exclusively to [the consignor] for payment of freight charges." *Id.* at 275.

¶ 24. The court of appeals also relied on two decisions which "apply the common-law presumption on consignee liability for freight charges in the traditional arrangement of consignor, trucking company and consignee." *Marine Bank,* 275 Wis. 2d 711, ¶ 19. In *Wylie,* an interstate motor carrier brought an action against the consignee to collect unpaid freight charges. In that case, there was a preexisting contract between the consignor and the consignee, designating the consignor liable for payment of the freight charges. However, the bills of lading did not indicate the amount of freight charges or who was liable for them. After the carrier was unsuccessful in recovering payments from the consignor, it brought an action demanding payment from the consignees. The Supreme Court of North Dakota held that "contract law ordinarily determines who is liable for payment of freight charges under the common law." *Wylie,* 523 N.W.2d at 399 (citing *Cent. Iron & Coal Co.,* 265 U.S. 59). Consequently, the court concluded that any common law presumption about responsibility for freight costs may be rebutted by evidence that the parties intended something else.[11] *Id.*

---

[11] To support this proposition, the court in Wylie cited the following authority: In re Roll Form Prod., Inc., 662 F.2d 150,

Thus, the court concluded that the circumstances presented evidenced an arrangement for exclusive consignor liability for the freight charges. The court held:

Although Wylie was not a party to [the consignee's] agreement with [the consignor], [the consignor] directed Wylie to bill it for transportation costs in a manner that conformed to the agreement between the [consignor] and [consignee]. During their entire business relationship, Wylie looked solely to [the consignor] for payment and billed it for freight charges after each delivery. . . . The bills of lading were silent as to the liability for and the amount of freight charges, and they thus confirmed [the consignee's] understanding that payment of freight charges was not a matter for its concern, but was a matter of contract between [the consignor] and Wylie.

*Id.* at 405–06 (citations omitted).

¶ 25. In *LTV Steel,* a carrier attempted to collect unpaid freight charges from a bankruptcy debtor's consignees. The debtor, as consignor, billed the consignees a net amount for the delivered materials, incorporating the freight charges. The consignor then paid the carrier for the freight charges until it became bankrupt. The bills of lading, which were marked "prepaid," were prepared by the debtors, signed by the carrier's agents, and billed directly to the consignor. The bankruptcy court determined that the carrier has a common law

154 (2d Cir. 1981); Consol. Freightways Corp. of Del. v. Admiral Corp., 442 F.2d 56, 61–62 (7th Cir. 1971); New York Cent. R. Co. v. Trans Am. Petroleum Corp., 108 F.2d 994, 997 (7th Cir. 1939); Schneider Nat'l, 855 F. Supp. at 273; LTV Steel, 78 B.R. at 722–723; In re Penn-Dixie Steel Corp., 6 B.R. 817, 820 (Bankr. S.D.N.Y. 1980); Consol. Freightways Corp. of Del. v. Peacock Eng'g Co., 628 N.E.2d 300, 304 (Ill. App 1993); Consol. Rail Corp. v. Hallamore Motor Transp., Inc., 473 N.E.2d 1137, 1138 (Mass. 1985); see also 13 Am. Jur. 2d Carriers 473 (1964).

right to collect the freight charges from the consignee, unless the parties contractually alter the liability. Although the bill of lading was marked "prepaid," the court held that this notation was one factor to consider in determining whether the parties had agreed that the consignor alone would be liable for the freight charges. *LTV Steel,* 78 B.R. at 724.

¶ 26. The bankruptcy court also listed other factors for a court to consider, including: (1) whether the carrier historically looked solely to the consignor for payment; (2) whether this was the understanding of the parties as evidenced by every facet of their business relationship; (3) whether the consignor alone contracted with the carrier for shipping services; (4) whether direct billing was effected from carrier to consignor, and direct billing took place after delivery; (5) whether the consignor paid freight charges from its general funds; (6) whether customer-consignees were billed by the consignors on a unitary basis (i.e. one net amount for delivered materials inclusive of freight); (7) whether the consignor deposited the sum received from the customer-consignees into its general accounts; (8) whether there was no request by, or agreement with, the carrier to segregate any portion of the funds received from customer-consignees, and none took place; (9) whether the two billing processes were not synchronized so as to give an impression that the consignor was the mere conduit between carrier and consignee; and (10) whether bills of lading and delivery tickets were marked prepaid to indicate consignor's liability and were signed by the carrier's agents without objection. *Id.* at 723–24. After weighing these factors, the court found that conduct of the parties evidenced an enforceable agreement and that the exclusive liability for the freight charges was that of the consignor.

¶ 27. While we agree with the court of appeals that the holdings in *Schneider National, Wylie,* and *LTV Steel* provide a helpful framework for the analysis of this case,[12] we conclude that the genuine issues of material fact here, as well as the conflicting and inconsistent presumptions, do not, without a more complete record, lead to a clear answer concerning whether there is exclusive liability for either the consignor or the consignee. Liability for payment of freight charges is ultimately a matter of contract, *see Schneider Nat'l,* 855 F. Supp. at 273, and, therefore, the presumptions concerning consignor and consignee liability for freight charges may be rebutted by evidence that the parties agreed to something else. *See id.; Wylie,* 523 N.W.2d at 399.

¶ 28. In Wisconsin, presumptions in civil cases are considered in accord with Wis. Stat. § 903.01, which states in relevant part:

> [A] presumption recognized at common law or created by statute, including statutory provisions that certain basic facts are prima facie evidence of other facts, imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.

In a case involving termination of parental rights, in discussing a rebuttable presumption of abandonment, we explained:

---

[12] While we recognize that these cases were decided before the ICC was repealed in 1995, each was based on common law contract principles, rather than the guidelines of the ICA.

The operation of sec. 903.01, Stats., works as follows. The party relying on the presumption "has the burden of proving the basic facts." 7 Daniel D. Blinka, *Wisconsin Practice* sec. 301.4 at 52 (1991). The term "burden" referred to in the statute refers to both the burdens of production and persuasion. Once the basic facts are found to exist, i.e., the petitioner has both produced evidence of those facts and convinced the jury of their existence, the burdens of persuasion and production shift to the party opposing the presumption. That party then bears the burden of proving "that the nonexistence of the *presumed* facts is more probable than its existence." Id.

As applied to this case then, sec. 903.01, Stats., requires that once [the petitioner] establishes the basic facts of abandonment by clear and convincing evidence, i.e., meets both the burden of production and persuasion, the burden shifts to [the respondent].

*Odd S.-G v. Carolyn S.-G.*, 194 Wis. 2d 365, 374, 533 N.W.2d 794 (1995).

¶ 29.   In that same case, in her dissenting opinion, then Justice Shirley S. Abrahamson recognized the difficulties that presumptions present:

The concept of presumptions has plagued courts and scholars for years primarily because the law uses the word "presumption" in many different ways. As a leading text explains, "one ventures the assertion that 'presumption' is the slipperiest member of the family of legal terms, except its first cousin, 'burden of proof.' " *McCormick on Evidence,* sec. 342 at 449 (4th ed. 1992). Professor Lansing has written in a similar vein that "the domain of presumptions has been called 'a place fraught with danger,' 'an impenetrable jungle,' 'a mist laden morass'—where more than one academician has been known to lose his way and, once returned, is never quite the same."

294

*Id.* at 384–85 (Abrahamson, J., dissenting) (footnotes omitted).

¶ 30. In this case, we are faced with conflicting and inconsistent presumptions. Professor Daniel D. Blinka, in his treatise on Wisconsin evidence, has offered the following observation on such presumptions: "Conflicting presumptions should rarely present a problem. Under § 903.01 it is impossible for opposing parties to both have the burden of persuasion on the same issue." 7 Blinka, *Wisconsin Practice: Wisconsin Evidence* § 301.4 at 73 (2d ed. 2001) (footnote omitted). For support of this proposition, Blinka cites both Weinstein's *Evidence,* par. 301[04] and the Judicial Council Committee's Note to Wis. Stat. § 903.01: "('Should inconsistent presumptions be established in a case, the weight of the evidence establishing the facts upon which the presumption[s] are premised [the basic facts] is for the trier of fact and not to be dealt with by the judge in the discharge of his function with respect to the law.')" 7 Blinka, *Wisconsin Practice: Wisconsin Evidence* § 301.4 at 73, n.10.

¶ 31. On remand, the circuit court, or the trier of fact if not the circuit court, must weigh the evidence establishing the facts upon which the presumptions relating to consignor and consignee liability are premised.[13] *See Schneider National,* 855 F. Supp. at 273.

---

[13] While we recognize that the Uniform Commercial Code (U.C.C.) governs the sale of goods, it may nonetheless be instructive here. *LTV Steel,* 78 B.R. at 723 n.12. Section 2–208(1) of the U.C.C. states: "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."

All of the factors discussed herein should be weighed in reaching a decision on the issue of exclusive liability.

## IV

¶ 32. In sum, we conclude that summary judgment was improperly granted to Marine Bank. Genuine issues of material fact, and reasonable alternative inferences drawn from undisputed facts, exist as to whether an agreement was made between Taz's and MBM, to the effect that Taz's could not seek payment from a consignee-customer of MBM. We further conclude that Taz's liability for payment of freight charges is governed by contract law, and that there exist common law presumptions that a consignee and a consignor may be liable for the payment of those freight charges. *See id.* at 273. Such presumptions may be rebutted, however, by evidence that the carrier and the consignor agreed that the consignor would be liable, exclusively, for such charges. Absent an express contract to that effect, such an agreement may be determined to exist through analysis of the conduct of the parties. *Id.* Here, however, the record is insufficient for a determination as to whether there was such an agreement. For these reasons, we reverse the court of appeals' decision affirming the summary judgment granted by the circuit court and remand this case for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and remanded.