METROPOLITAN VENTURES, LLC, a Wisconsin limited liability company, Plaintiff-Appellant,

v.

GEA ASSOCIATES, a Wisconsin limited partnership, Elizabeth Levins, and Margaret Reuss, as Trustee of the Henry S. Reuss Trust, Defendants-Respondents.†

Court of Appeals

*No. 03–1806. Oral argument June 8, 2004.—Decided September 14, 2004.*

**2004 WI App 189**

(Also reported in 688 N.W.2d 722.)

† Petition to review granted 12-15-2004.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *William M. Cannon* and *Charles David Schmidt* of *Cannon & Dunphy, S.C.*, Brookfield. There was oral argument by *Charles David Schmidt*.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Charles H. Barr* of *Croen & Barr LLP*, Milwaukee. There was oral argument by *Charles H. Barr*.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. WEDEMEYER, P.J. Metropolitan Ventures, LLC appeals from a judgment entered after the trial court granted summary judgment in favor of GEA Associates, Elizabeth Levins and Margaret Reuss, dismissing Metropolitan's complaint alleging that GEA Associates breached its contractual, legal and ethical duties. Metropolitan asserts that the trial court erred in ruling that no valid contract existed based on *Nodolf v. Nelson*, 103 Wis. 2d 656, 309 N.W.2d 397 (Ct. App. 1981), which held that the absence of specific financing terms rendered the contract illusory. Because the financing contingency did not render the contract illusory and because there is a material issue of fact regarding whether the financing contingency was waived, we reverse and remand for further proceedings.

## I. BACKGROUND

¶ 2. On March 19, 2002, Metropolitan and GEA Associates executed a "Limited Partnership Purchase Agreement" (LPPA), wherein Metropolitan would purchase GEA Associates, a business engaged in owning and operating the German English Academy Building, and a parking garage. The LPPA contained a financing contingency provision. The provision required that Metropolitan waive the contingency "within 30 days following full execution of this Agreement" or the "Agreement shall terminate without further force or effect."

¶ 3.  On April 17, 2002, Daniel B. Genzel, Metropolitan's managing partner, sent a letter to Elizabeth Levins, sole general partner of GEA Associates,[1] indicating that Metropolitan was "waiving its financing contingency" subject to three conditions. The letter requested certain documents from GEA Associates to complete financing approval and asked for an extension of the financing contingency until April 25, 2002. After receiving the letter, Levins forwarded the requested documents and granted the extension.

¶ 4.  On April 25, 2002, Genzel sent a letter to Levins indicating that Metropolitan had received a satisfactory loan commitment from Anchor Bank and looked forward to closing the transaction. On April 29, 2002, Levins sent a letter to GEA Associates' limited partners explaining the LPPA, recommending the sale, and indicating the deal required two-thirds of the limited partners to sell their interests. Levins advised:

> The general partners believe that selling to Metropolitan is in the best interests of the partners, and recommend that all of the limited partners participate in the sale . . . . [W]e are recommending a unanimous sale.
>
> If a sufficient number of limited partners agree to participate in the sale, the initial closing will take place on or about May 18, 2002. It will take approximately 60 days beyond the date of the initial closing to wind up the accounting . . . .

¶ 5.  Sometime between May 1 and May 13, Genzel and Levins confirmed the financing waiver at a lunch meeting. On May 14, 2002, Genzel sent Levins a letter confirming:

---

[1] Henry S. Reuss, deceased, was also a general partner of GEA Associates until his death on January 12, 2002. The Henry S. Reuss Trust is his successor in interest.

that all of the contingencies on behalf of the Buyer have been satisfied and that Buyer is ready, willing and able to close the above-mentioned transaction.

As a follow up from our last meeting at lunch we are inquiring about the progress of the assignments of the interest in the Partnership from the Limited Partners. As you had mentioned that day you had thought that some of them might be late in responding to your letter as a General Partner recommending unanimous approval of the sale of the interest to the Buyer.

We would like to schedule a potential date of closing for Wednesday June 5, 2002 . . . .

¶ 6.  However, on May 10, 2002, Levins sent a letter to the limited partners advising:

On May 8, 2002, the partnership received an unsolicited secondary offer to purchase the partnership real estate at a price that significantly exceeds the base purchase price to be paid under the pending contract with Metropolitan . . . . The buyer under the secondary offer is Steadfast Capital, LLC . . . .

¶ 7.  The letter informed the limited partners that they were not bound to sell to Metropolitan and, in fact, the Metropolitan agreement would terminate if two-thirds of the limited partners did not agree to the sale. Attached to the letter was a summary term sheet comparing the principal economic terms of the two transactions. The letter also gave limited partners who had already agreed to sell their interest to Metropolitan the opportunity to revoke that decision.

¶ 8.  On May 17, 2002, GEA Associates faxed a letter to Metropolitan asserting that the LPPA was terminated due to the inability to satisfy the two-thirds limited partnership assignments. On July 11, 2002,

629

GEA Associates filed a declaratory judgment action asking the court to hold that it had properly and validly terminated the LPPA.[2]

¶ 9.  On September 17, 2002, Metropolitan filed a summons and complaint seeking damages based on GEA Associates' actions relating to the LPPA. This case was consolidated with the declaratory judgment action. On March 3, 2003, GEA Associates filed a motion to dismiss the case. On April 30, 2003, the trial court dismissed some of Metropolitan's claims, but allowed Metropolitan to proceed on its intentional interference with the contractual relationship, breach of implied duty of good faith, and negligence claims.

¶ 10.  Subsequently, GEA Associates filed a motion seeking summary judgment, asserting that no contract existed due to the lack of sufficient definiteness in the financing contingency provision. The trial court agreed with GEA Associates' argument and granted the motion dismissing the case. Judgment was entered. Metropolitan now appeals.

## II. DISCUSSION

■

¶ 11.  This case comes to us on a motion for summary judgment. The summary judgment standard of review is well known and need not be repeated here. *See Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). We will affirm the granting of summary judgment if there are no genuine issues of

---

[2] While these actions were pending, GEA Associates received a higher offer to purchase from a third party. As a result, GEA Associates entered into an agreement to pay Steadfast $200,000 to terminate that contract and went on to sell to the third party.

material fact and one party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2001–02).[3] Whether the essential terms of a contract are definite presents a question of law that we review *de novo*. *Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc.*, 2004 WI App 134, ¶ 6, 275 Wis. 2d 349, 685 N.W.2d 564.

██

¶ 12. The threshold issue is whether a valid contract existed. Metropolitan argues that the financing terms were definite enough under the law to result in a valid contract. GEA Associates argues that the financing terms were indefinite and too vague and therefore rendered the contract void. The trial court, relying on *Nodolf*, ruled in favor of GEA Associates and dismissed all of Metropolitan's claims. We hold that the financing terms were not illusory, and therefore did not invalidate the contract. Accordingly, we reverse the trial court's ruling and remand for further proceedings consistent with this opinion.

¶ 13. The financing clause at issue provides:

> Financing Contingency. Buyer shall have obtained unconditional financing in an amount equal to 85% of the purchase price from a reputable Lender on terms satisfactory to Buyer and an appraisal which is satisfactory to Buyer in Buyer's sole discretion. Unless Buyer waives this contingency by written notice to Seller within 30 days following full execution of this Agreement, this Agreement shall terminate without further force or effect and Buyer's earnest money shall be promptly returned.

---

[3] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 14. The trial court ruled that the financing clause lacked sufficient definiteness for it to determine the terms of financing, and therefore the entire contract was rendered unenforceable. *See Nodolf*, 103 Wis. 2d at 659. Metropolitan argues that *Nodolf* and cases similar to it all apply to real estate transactions. Metropolitan contends that the specificity in financing contingency rules has never been extended to business sale contracts. It concludes, therefore, that because the LPPA was a business sale contract rather than a real estate transaction, the *Nodolf* line of cases do not control. We are persuaded by the logic of this argument.

¶ 15. A business sale is distinct from a real estate sale. Specifically, when a transaction involves the sale of a business, the contract does not involve a fixed sale price due to the possibility that the buyer may not acquire a 100% ownership interest. The value of the business may also fluctuate between the time the contract is entered into and the actual closing date. As a result, the business sale buyer is unable to specify in the written contract the same terms and conditions as a buyer of real estate. The business sale presents unique characteristics. Accordingly, this court cannot rule that the cases setting forth financing requirements in real estate sales control the outcome of this case.

¶ 16. We recently addressed a similar issue in *Herder Hallmark*. In that case, John Herder sold his actuarial business to Steven Regnier. 2004 WI App 134, ¶ 2. However, the sale did not specify the sale price. *Id.*, ¶ 4. Regnier argued, as a result, that no contract existed and that "indefiniteness voids any agreement." *Id.*, ¶ 1. The trial court granted partial summary judgment to Herder, declaring that there was an express contract between Herder, Inc. and Regnier. *Id.* We granted Regnier's petition for leave to appeal.

632

¶ 17.   In *Herder*, we determined that a "meeting of the minds" as to contract price is not required as long as the intent of the parties to contract is "discernible from their conduct or the contract language":

> If parties evidently intended to enter a contract, the trier of fact should not frustrate their intentions, but rather should attach a "sufficiently definite meaning" to the contract language if possible. We have previously decided:  "Even though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by their subsequent conduct and by their own practical interpretation." *Nelson v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 51, 90 N.W.2d 123 (1958).

*Id.*, ¶ 8 (quoting *Management Comp. Servs. Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 179–80, 557 N.W.2d 67 (1996) (citations omitted)). This court went on to quote CORBIN ON CONTRACTS, adopting that treatise's rule that when a term is left indefinite, the contract will not be void for indefiniteness so long as the parties provide a practicable method for determining what the indefinite term will be or implicitly agree upon a reasonable definition of the term. *Herder*, 2004 WI App 134, ¶ 9 (citing 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS:   *Formation of Contracts* § 4.3 (Joseph M. Perillo, ed., rev. ed. 1993)).

¶ 18.   This case offers substantial guidance to resolution of the case at hand, particularly because the *Herder* case is more akin to the sale of a business than the *Nodolf* line of cases. Moreover, *Herder* involved the failure to specify a sale price, which is similar to GEA Associates's contention that the financing clause in the LPPA was too indefinite. Consistent with the reasoning

in *Herder*, the evidence in the instant case demonstrates that the parties clearly intended to enter into a contract. Although the financing terms were not set forth with explicit specificity, the parties agreed to the relatively indefinite language because this was customary practice given the distinct characteristics of this type of sale. GEA Associates agreed to give Metropolitan the discretion to select the lending institution[4] and the financing terms. In addition, the financing clause in the instant case contains more specificity than the agreement in *Herder*—it set forth the percentage of the purchase price to be financed and it set forth a practicable method in which the sale price would be determined.

¶ 19.  In examining the clause in the context of the entire agreement, it clearly indicates, with as much specificity as possible, the amount of money which was to be financed—85% of the purchase price, which is specifically addressed in Article II, section 2.1 a. of the LPPA. That clause sets forth the practicable method for determining the purchase price:

> The base amount to be used in determining the Purchase Price shall be $3,300,000 ("Base Amount"). Within 60 days following Closing, the accounting firm of Reilly, Penner & Benton, or another accounting firm acceptable to both parties (the "Accountants"), shall prepare an interim balance sheet for the Partnership dated as of the date of Closing. The Base Amount shall

---

[4] The financing clause does not specify a particular lending institution but, even in the real estate line of cases, we have held that in certain circumstances, "the particular lending institution was not an essential term of the clause and it made no difference from whom the buyer obtained his loan." *Gerruth Realty Co. v. Pire*, 17 Wis. 2d 89, 93, 115 N.W.2d 557 (1962) (citing *Kovarik v. Vesely*, 3 Wis. 2d 573, 89 N.W.2d 279 (1958)).

then be increased or decreased, as the case may be, by an amount equal to the net book value of tangible Partnership assets (tangible assets minus liabilities), excluding Partnership real estate and the items of furniture, fixtures and equipment described on Exhibit C, as shown on the interim balance sheet. For example, but not by way of limitation, the interim balance sheet shall reflect the following as partnership liabilities: (i) accounts payable, (ii) mortgage debt, (iii) unearned rent, (iv) security deposits, (v) the excess (or deficit) of amounts collected from tenants over amounts due from tenants for real estate taxes, common area expenses, and/or other amounts payable by Tenants under the leases for periods up to and including the date of Closing, (vi) accrued employee compensation, and (vii) real estate tax and utilities accrued through the date of Closing; and shall reflect the following as partnership assets: (x) cash, (y) past due rent and other amounts receivable from tenants, and (z) prepaid insurance and other prepaid expenses. The Base Amount shall also be increased by the unamortized value of any leasehold improvements made by the Partnership with respect to leases to tenants commencing in 2002. The Base Amount so adjusted shall be referred to herein as the "Adjusted Base Amount."

¶ 20. The financing clause at issue here does not specify a particular term or rate of financing, but this does not render the contract illusory. Because of the fluidity involved in the sale of the business, financing terms could vary greatly over the course of a short period of time and thus, inserting those items into the contract would require speculation. Moreover, the specific mechanism set forth above makes definite what the discretionary financing clause left open. Accordingly, we reject GEA Associates' argument that the financing clause lacks sufficient definiteness. Article II, section 2.1 a. of the LPPA demonstrates that the parties

modified the general financing contingency to provide a specific formula with which to calculate the required terms. We cannot find any Wisconsin authority which requires greater exactitude in a financing contingency for a business sale than that which was employed in the LPPA.

¶ 21. Further, this court concluded in *Herder*, that "the conduct of the parties cures any indefiniteness as to the price of the assets." *Id.*, ¶ 15. The same conclusion applies to the instant case. Metropolitan and GEA Associates did not enter into the LPPA haphazardly. Drafts of the agreement were exchanged numerous times and revisions made accordingly. The conduct of the parties after the agreement was executed similarly established that both sides intended to contract and intended to be bound by the terms of the contract. Both acted as if the contract existed. Metropolitan solicited lending institutions to satisfy the financing contingency. GEA Associates provided necessary documentation requested for appraisal purposes. GEA Associates informed the limited partners of the existence of the contract and recommended the assignment of interests to Metropolitan.

¶ 22. It was not until GEA Associates received a better offer that actions quickly turned to attempting to terminate the contract between Metropolitan and GEA Associates. Prior to that point in time, both parties operated as if the LPPA constituted a valid contract. This is significant. Based on the foregoing, we conclude that any indefiniteness in the financing clause did not render the contract void or illusory.

■

¶ 23. Having concluded that the financing contingency did not render the LPPA illusory, we now turn to the issue of whether the financing contingency was

waived. Metropolitan argues that it waived the financing contingency or at least there is a question of fact on this issue. GEA Associates asserts that there is no evidence of a timely waiver by Metropolitan and that there is no evidence demonstrating that there is a material issue of disputed fact as to this issue. We agree with Metropolitan that this is a question of fact.

¶ 24. The record reveals the following facts. On April 17, 2002, Metropolitan notified GEA Associates that it had found three banks interested in financing the transaction, subject only to the receipt and approval of various documents in GEA Associates' possession. Metropolitan requested a one-week extension of the deadline to waive the financing contingency to allow for the exchange and review of the necessary documents. GEA Associates granted the extension, which resulted in April 25, 2002, as the final date on which Metropolitan had to waive its financing contingency.

¶ 25. On April 25, 2002, Metropolitan sent a letter to GEA Associates stating that: "This letter shall serve as Notice that the Buyer in the above referenced transaction has received a satisfactory loan commitment from Anchor Bank, FSB. If you have any questions regarding this please don't hesitate to call. We look forward to closing this transaction shortly." Metropolitan asserts that this letter constituted a waiver of the financing contingency. Metropolitan also points to affidavits, which attest to a May 1, 2002 phone call between representatives of both sides confirming that the April 25th letter was intended to constitute a waiver of the contingency. Metropolitan also offers evidence of a lunch meeting, which occurred sometime in early May, wherein Genzel and Levins confirmed that the contingency was timely waived.

¶ 26. In addition, the record contains an April 29,

2002 letter from Levins to the limited partners of GEA Associates wherein she advises: "the only contingency remaining is acceptance of Metropolitan's offer by two thirds of the limited partners .... we chose to wait until *all of their other contingencies* were satisfied before recommending this transaction to our limited partners." (Emphasis added.)

¶ 27. Finally, on May 14, 2002, Genzel sent a letter to Levins confirming "that all of the contingencies on behalf of the Buyer have been satisfied and that Buyer is ready, willing and able to close the above-mentioned transaction."

¶ 28. GEA Associates argues that waiver did not occur timely. It contends that the April 25th letter cannot reasonably be interpreted to constitute a waiver of the financing contingency. As a result, it argues that any actions subsequent to the April 25th deadline are irrelevant because, according to the contract, the financing contingency waiver had to take place by that date or the contract was void.

¶ 29. In reviewing this series of events, we cannot conclude as a matter of law that waiver did or did not timely take place. The reason for this is that given the facts and circumstances as well as the conduct of the parties, a question of fact as to whether waiver occurred is presented. We conclude that after presentation of all of the evidence, a reasonable jury could determine that waiver timely occurred. Of course, a jury may also determine that waiver was untimely. This question, however, should be resolved by a fact finder and not this court. Therefore, we reverse the judgment and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded.