METROPOLITAN VENTURES, LLC,
a Wisconsin limited liability company,
Plaintiff-Appellant,

v.

GEA ASSOCIATES, a Wisconsin limited partnership,
Elizabeth Levins, and Margaret Reuss, as
Trustee of the Henry S. Reuss Trust,
Defendants-Respondents-Petitioners.

Supreme Court

*No. 2003AP1806. Oral argument October 11, 2005.
—Decided June 14, 2006.*

2006 WI 71

(Also reported in 717 N.W.2d 58.)

For the defendants-respondents-petitioners there were briefs by *Charles H. Barr* and *Croen & Barr LLP,* Milwaukee, and oral argument by *Charles H. Barr.*

For the plaintiff-appellant there was a brief by *William M. Cannon, Charles David Schmidt* and *Cannon & Dunphy, S.C.,* Brookfield, and oral argument by *Charles David Schmidt.*

¶ 1. LOUIS B. BUTLER, JR., J. Metropolitan Ventures, LLC ("Metropolitan") seeks review of a decision by the court of appeals reversing and remanding the circuit court's grant of summary judgment in favor of GEA. *Metropolitan Ventures v. GEA Assocs.,* 2004 WI App 189, 276 Wis. 2d 625, 688 N.W.2d 722.

¶ 2. At issue in this case is a contract between Metropolitan and GEA Associates ("GEA"), a limited partnership, for the sale and purchase by Metropolitan of the GEA partnership as well as a building owned by the partnership. GEA asserts that the contract was unenforceable because the financing terms rendered the contract indefinite and illusory.

¶ 3. The circuit court for Milwaukee County, Honorable Jeffrey A. Kremers, granted GEA's motion for summary judgment and dismissed the case. The circuit court found that no contract existed due to the lack of sufficient definiteness in the financing contingency provision. Metropolitan appealed. The court of appeals reversed and remanded, concluding that the financing contingency did not render the contract illusory, but that there existed an issue of material fact as to whether GEA waived the financing contingency. Metropolitan asks this court to affirm part of the court of appeals' decision, reverse part of the court of appeals' decision, and remand the case for further proceedings.

¶ 4. Upon review, we find that the parties' subsequent actions clearly demonstrate their earlier intent to contract for the sale and purchase of GEA. We therefore conclude that the contract at issue is not indefinite and is enforceable. However, we find that genuine issues of material fact exist as to whether representatives of GEA complied with their duty of good faith owed to Metropolitan, and whether GEA used its "best efforts" to ensure that GEA did not dispose of its assets or otherwise violate the terms and conditions of the "Limited Partnership Purchase Agreement" ("LPPA"). We therefore affirm the court of appeals' reversal on other grounds, and remand this matter to the circuit court for further proceedings consistent with this opinion.

I

¶ 5. Metropolitan is a business engaged in real estate investment and development. GEA is a limited partnership that was established to preserve and renovate the German English Academy Building, located in Milwaukee, Wisconsin. On March 19, 2002, Metropolitan and GEA entered into the LPPA, whereby Metro-

politan agreed to purchase all of the general partnership interests and certain limited partnership interests of GEA.[1] The LPPA was negotiated between Elizabeth Levins, managing partner of GEA,[2] and Daniel B. Genzel, Metropolitan's managing partner. Levins was a licensed broker and the LPPA included a 6 percent brokerage fee, divided evenly between Levins and MLG Commercial LLC.

¶ 6. Under the LPPA, Metropolitan was required to obtain unconditional financing equal to 85 percent of the purchase price "on terms satisfactory to Buyer . . . ." GEA was required to deliver to Metropolitan assignments of at least $66^{2}/_{3}$ percent of the outstanding units owned by the limited partnership ("Assignment Agreements"). GEA agreed to "use its reasonable best efforts to obtain Assignment Agree-

---

[1] This contract was the second contract between Metropolitan and GEA. On November 8, 2001, Metropolitan and GEA entered into an agreement for Metropolitan to purchase the building owned by GEA ("Building Contract"). That Building Contract included a provision requiring approval of the sale by the owners of at least two-thirds of the limited partnership units in GEA. Within two weeks, nearly every limited partner had approved the sale to Metropolitan. On November 28, 2001, Levins wrote to Metropolitan and waived the two-thirds limited partnership approval contingency. However, on January 7, 2002, Metropolitan canceled the November Building Contract. The second LPPA also required two-thirds limited partnership approval.

[2] Elizabeth Levins was a registered agent and the general partner in charge of GEA's day-to-day activities. Henry S. Reuss was also a general partner of GEA until his death on January 12, 2002. The Reuss Trust did not take an active part in managing GEA. According to the record, at the time GEA entered into the LPPA, the Reuss Trust held 40.94 percent interest in GEA and Levins held 5.51 percent interest in GEA.

ments from all the limited partners" by recommending to each limited partner that they participate in the sale and requesting the limited partners execute an assignment of their partnership interest(s). GEA was further obligated to use its best efforts to ensure that the Partnership did not "[s]ell or dispose of any asset . . . of the partnership."

¶ 7. On April 17, 2002, Daniel Genzel sent a letter to Elizabeth Levins requesting certain documents from GEA that were required for Metropolitan to complete the financing application. Metropolitan's letter further asked for an extension of the financing contingency until April 25, 2002. Levins forwarded the requested documents and granted the extension.

¶ 8. On April 25, 2002, Genzel sent a letter to Levins indicating that Metropolitan had received a satisfactory loan commitment from Anchor Bank and that Metropolitan continued to look forward to closing the transaction.[3]

¶ 9. On April 29, 2002, Levins sent a letter to GEA's limited partners explaining the details of the LPPA agreement and recommending the limited partners sell to Metropolitan their interest in GEA. The letter stated, in pertinent part:

> The general partners [of GEA] have agreed to sell their interests, and *the only contingency* remaining is acceptance of Metropolitan's offer by two thirds of the limited partners. Because of our last experience with

---

[3] The court of appeals remanded the case to determine whether this letter constituted a proper waiver of the financing contingency. Because we find that Genzel's letter constituted timely waiver of the financing contingency, we do not remand this case to the trial court to address that issue.

Metropolitan,[4] we chose to wait until all of [Metropolitan's] other contingencies were satisfied before recommending this transaction to our limited partners. (Emphasis added.)

¶ 10. Levins' April 29 letter asked the limited partners to reply by May 15, 2002. However, on May 8, 2002, GEA received an offer to purchase from a second party, Steadfast Capital, L.L.C. ("Steadfast").[5] Levins rejected the May 8 Steadfast offer and counter-offered on May 10. Steadfast accepted GEA's May 10 counter-offer. GEA's agreement with Steadfast constituted a secondary offer and would therefore not become effective unless and until the existing LPPA was terminated. Steadfast agreed to purchase GEA for $3,750,000, a higher sale price as compared to the Metropolitan offer, $3,255,000. Steadfast also agreed to pay a brokerage fee of 7 percent, evenly divided between Levins and MLG Commercial LLC.

¶ 11. GEA contends that prior to the May 10 agreement with Steadfast, GEA had not received responses from all the limited partners regarding the sale to Metropolitan. On May 10, 2002, Levins sent a letter to GEA's limited partners informing them that GEA had "received an unsolicited secondary offer [from Steadfast] to purchase the partnership real estate at a price that significantly exceed[ed] the base purchase price to be paid under the pending contract with Metropolitan Ventures, LLC." Levins' letter further informed the limited partners that they were not bound to sell to Metropolitan and that GEA's agreement with

---

[4] Metropolitan withdrew its first offer to purchase the real estate from GEA. *See supra* note 1.

[5] The parties dispute whether Levins solicited Steadfast for this offer.

Metropolitan would terminate if two-thirds of the limited partners did not agree to the sale to Metropolitan. The letter gave the limited partners who had already agreed to sell to Metropolitan the opportunity to revoke that decision.

¶ 12. The letter stated, in pertinent part:

> As we have told you, the transaction with Metropolitan involves the purchase and sale of partnership interests (rather than the real estate itself), and the limited partners are not contractually bound to sell to Metropolitan.
>
> . . . .
>
> The agreement with Metropolitan requires the general partners to recommend that all limited partners participate in the sale to Metropolitan. We have done so. However, as fiduciaries, we are also obligated to advise you of the terms and conditions of the Steadfast Offer, so that you know all the facts before making your decision.
>
> . . . .
>
> If you decide to sell your partnership interest to Metropolitan, you must sign and return the Assignment form (previously provided) on or before May 25, 2002. If you do not wish to sell to Metropolitan, kindly complete and return the enclosed response sheet. If you previously completed and returned the Assignment form and now wish to change your decision, please indicate that change on the enclosed response sheet.

¶ 13. In the May 10, 2002, letter, Levins also included a chart comparing the two potential sales. As with her April 29 letter encouraging the limited partners to agree to the sale to Metropolitan, the chart included in Levins' May 10 mailing indicated that, with regard to the sale to Metropolitan under the LPPA, "[n]o other contingencies remain."

¶ 14. The record does not clearly demonstrate, and the circuit court made no finding, as to whether the required two-thirds percent of limited partners had agreed to the sale to Metropolitan prior to Levins' May 10 letter.

¶ 15. On May 14, Genzel sent Levins a letter confirming that all of Metropolitan's contingencies had been met and that Metropolitan was "ready, willing, and able to close the [LPPA] transaction." In the letter, Genzel inquired about Levins' progress with obtaining the required two-thirds assignments from GEA's limited partners. Genzel suggested a closing date of June 5, 2002.

¶ 16. Between May 10 and May 17, 2002, Levins received responses from a majority of the limited partners regarding the Steadfast offer. On May 17, 2002, GEA faxed a letter to Metropolitan stating that the LPPA between Metropolitan and GEA was terminated because GEA had been unable to secure the required two-thirds limited partnership assignments.[6]

¶ 17. On July 11, 2002, GEA filed a declaratory judgment action asking the court to hold that GEA had properly and validly terminated the LPPA. On September 17, 2002, Metropolitan filed a summons and complaint seeking damages based on the actions of GEA and its representatives. Metropolitan's complaint was consolidated with GEA's request for a declaratory judgment. On April 30, 2003, the circuit court dismissed some of

---

[6] We note that although Steadfast accepted GEA's May 10 offer, GEA received an offer to purchase from a third party for $3,800,000 while the Steadfast offer was pending. GEA ultimately agreed to pay Steadfast $200,000 to terminate the contract between GEA and Steadfast and sold the GEA partnership to the third party on August 30, 2002. The sale of GEA to this third party, however, is not before this court.

Metropolitan's claims,[7] but allowed Metropolitan to proceed with the following claims against GEA: (1) intentional interference with the contractual relationship; (2) breach of implied duty of good faith; and (3) negligence. The circuit court did not grant GEA's motion for summary judgment based on GEA's theory that there was no contract.

¶ 18. GEA then filed a motion for summary judgment, asserting that no contract existed due to the lack of sufficient definiteness in the financing contingency provision. On May 22, 2003, the circuit court adopted GEA's "no contract" theory, finding the contract indefinite and unenforceable, and dismissed Metropolitan's remaining claims against GEA.

¶ 19. The court of appeals reversed, concluding that the financing contingency did not render the contract illusory, and remanded because there existed an issue of material fact regarding Metropolitan's claim that the financing contingency was waived.

II

¶ 20. This matter is before us following the circuit court's grant of summary judgment, which was subsequently reversed by the court of appeals. We review summary judgment decisions de novo, benefiting from the circuit court's decision, but applying the same methodology as the circuit court. *Linden v. Cascade Stone Co., Inc.*, 2005 WI 113, ¶ 5, 283 Wis. 2d 606, 699 N.W.2d 189. We examine all evidence presented to the circuit court

---

[7] Metropolitan originally filed claims against GEA for breach of contract, breach of implied duty of good faith, intentional interference with contract, breach of fiduciary duty, negligence, and conversion. The trial court dismissed the claims against GEA for breach of contract, breach of fiduciary duty, and conversion.

and determine whether a genuine issue exists as to any material fact, or whether reasonable conflicting inferences may be drawn from the undisputed facts. *State Bank of La Crosse v. Elsen,* 128 Wis. 2d 508, 511, 383 N.W.2d 916 (Ct. App. 1986). "All reasonable inferences drawn from the underlying facts contained in these documents that are in the record must be viewed in the light most favorable to the non-moving party." *Johnson v. Rogers Memorial Hosp., Inc.,* 2005 WI 114, ¶ 30, 283 Wis. 2d 384, 700 N.W.2d 27 (citing *Grams v. Boss,* 97 Wis. 2d 332, 339, 294 N.W.2d 473 (1980)).

¶ 21. Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing Wis. Stat. § 802.08(2) (2003–04)).[8] "An issue of fact is genuine if a reasonable jury could find for the nonmoving party. A material fact is such fact that would influence the outcome of the controversy." *Marine Bank v. Taz's Trucking, Inc.,* 2005 WI 65, ¶ 12, 281 Wis. 2d 275, 697 N.W.2d 90 (citations omitted). Therefore, summary judgment is appropriate only when there is no dispute over facts that would affect the outcome of the case.

¶ 22. This case also presents issues of contract formation.[9] In evaluating the formation of a contract, this court examines whether a contractual provision is

---

[8] All references are to the 2003–04 statutes unless otherwise noted.

[9] The definiteness requirement is an issue of contract formation, not interpretation. *Management Computer Servs.,*

"definite as to the parties' basic commitments and obligations." *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) (citation omitted). A contract must be definite and certain as to its basic terms and requirements to be enforceable. *Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc.,* 2004 WI App 134, ¶ 8, 275 Wis. 2d 349, 685 N.W.2d 564 (citation omitted). Whether provisions of a contract are definite "is a question of law which an appellate court decides independently of the circuit court's decision." *Energy Complexes, Inc. v. Eau Claire County,* 152 Wis. 2d 453, 467, 449 N.W.2d 35 (1989).

## III

¶ 23. In the present case, GEA asserts that the financing contingency contained in Section 5.7 of the LPPA was indefinite and illusory, and therefore unen-

*Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 181–82, 557 N.W.2d 67 (1996). This is because the vagueness or indefiniteness of an essential contract term actually prevents the creation of an enforceable contract. *Id.* at 178.

For this reason, good faith cannot cure a contract's indefiniteness. *Gerruth Realty Co. v. Pire,* 17 Wis. 2d 89, 94, 115 N.W.2d 557 (1962). This is because no contract exists unless and until issues concerning indefiniteness are resolved; good faith has nothing to do with contract formation. It is about the parties' performance in a contract setting. "[G]ood faith is another way to describe the effort to devise terms to fill contractual gaps. As a method to fill gaps, it has little to do with the formation of contracts." *Hauer v. Union State Bank of Wautoma,* 192 Wis. 2d 576, 597, 532 N.W.2d 546 (Ct. App. 1995) (citing *Continental Bank, N.A. v. Everett,* 964 F.2d 701, 705 (7th Cir. 1992)).

Therefore, Metropolitan was under no good faith duty to obtain financing unless the financing contingency was definite enough to have formed an enforceable contract.

forceable. We first examine whether the financing contingency expressed in the LPPA is indefinite, thereby rendering the entire contract between Metropolitan and GEA void and unenforceable.

¶ 24. A financing clause is sufficiently definite if it establishes that the parties agreed to the terms of financing. *Gerruth Realty Co. v. Pire,* 17 Wis. 2d 89, 93, 115 N.W.2d 557 (1962). Certainty of contract terms and definiteness require mutual assent by way of a meeting of the minds. *Herder Hallmark,* 275 Wis. 2d 349, ¶ 8 (citation omitted). This court has concluded that there need not be a literal meeting of the minds because "mutual assent is judged by an objective standard." *Management Computer,* 206 Wis. 2d at 178. The question is whether there is sufficient evidence to ascertain the intent of the parties; this court examines both the wording of the contract as well as the surrounding circumstances in an attempt to discern the parties' intent. *Management Computer,* 206 Wis. 2d at 179, *Gerruth,* 17 Wis. 2d at 91–92.

¶ 25. When there is evidence that two parties intended to enter into the contract, "the trier of fact should not frustrate their intentions, but rather should attach a 'sufficiently definite meaning' to the contract language *if possible."* *Management Computer,* 206 Wis. 2d at 179 (citations omitted) (emphasis added). In order to hold a contract void for indefiniteness, the "[i]ndefiniteness must reach the point where construction becomes futile." *Id.* at 180 (citations and quotations omitted). Yet, even if the parties' written agreement is expressed in "terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty," the parties' subsequent conduct and practical

interpretation can cure this defect by evincing the parties' intent in entering the contract. *Id.* at 179–80 (citations omitted). Therefore, a contract that fails to sufficiently address the financing contingency is not void for indefiniteness if the parties' subsequent actions clarify the parties' intent at the time they entered into the contract. *Gerruth,* 17 Wis. 2d at 91–92.[10] *See also Herder Hallmark,* 275 Wis. 2d 349, ¶ 10 (finding the subsequent actions sufficient to cure any indefiniteness with respect to the lack of a sale price when the purchaser hired the seller's employees, took over the operation of the business, and the parties attempted to reach a fair contract price).

¶ 26. However, in order for the subsequent action to remove any indefiniteness, the action must include "some interpretative conduct by *both* parties, consisting either of the rendition of some performance by each one or by the willing acceptance by one of them of such a performance rendered by the other." *Nodolf v. Nelson,* 103 Wis. 2d 656, 659, 309 N.W.2d 397 (Ct. App. 1981) (quoting 1 *Corbin on Contracts* sec. 101 at 459 (2d ed. 1963)) (concluding that an agreement with an indefinite financing contingency cannot become definite simply because the purchaser obtains financing because *unilateral action by one party is not enough*) (emphasis added)). *See also Gerruth,* 17 Wis. 2d at 94.

¶ 27. Here, the LPPA's financing contingency states:

---

[10] In *Gerruth,* although this court examined the surrounding circumstances, it found that it could not determine the parties' intent regarding the meaning of the financing contingency. *Gerruth,* 17 Wis. 2d at 93–95.

Buyer shall have obtained unconditional financing in an amount equal to 85% of the purchase price from a reputable Lender on terms satisfactory to Buyer and an appraisal which is satisfactory to Buyer in Buyer's sole discretion. Unless Buyer waives this contingency by written notice to Seller within 30 days following full execution of this Agreement, this Agreement shall terminate without further force or effect and Buyer's earnest money shall be promptly returned.

¶ 28. GEA contends that the contingency is vague and indefinite because the requirement that the financing terms be "satisfactory to the Buyer" fails to include any information regarding the terms of the financing that Metropolitan had in mind. *See Gerruth,* 17 Wis. 2d at 92.

¶ 29. We agree that the parties failed to specify financing terms in the written contract. The critical question in determining the enforceability of the LPPA, therefore, becomes whether there exists sufficient evidence of subsequent conduct in the record upon which this court can ascertain whether the parties mutually agreed to acceptable financing terms at the time the LPPA was formed.

¶ 30. The record reveals that the subsequent acts of both Metropolitan and GEA provide sufficient evidence of the parties' intent, rendering the contract enforceable. The correspondence between the parties indicates that the parties developed a cooperative relationship in attempting to ensure that the sale came to fruition. Metropolitan sought financing for the purchase of the GEA partnership. On April 17, 2002, Metropolitan requested additional information from GEA required for the bank loan and asked for a short extension in order to meet the financing contingency. GEA provided Metropolitan with the information re-

quested and granted the extension without any objection. Metropolitan ultimately obtained adequate financing from Anchor Bank. GEA made no objection to Metropolitan's assertion that Metropolitan had met the financing contingency and was able to close. Levins' April 29 letter to GEA's limited partners explicitly recognized Metropolitan had met the requisite financing contingency and recommended that the limited partners sell their interest in GEA to Metropolitan. Levins' May 10 mailing also indicated that the financing contingency had been met.

¶ 31. In short, the correspondence among the parties and between GEA and its limited partners clearly demonstrates that both parties at the time they entered into the contract intended to form a binding contract for the sale and purchase of the GEA partnership. Prior to the May 8, 2002 Steadfast offer, both parties clearly treated the LPPA as a certain, definite, and enforceable contract. *Compare Krause v. Holand,* 33 Wis. 2d 211, 217, 147 N.W.2d 333 (1967). Neither party expressed any signs of confusion regarding the financing contingency. The parties would have proceeded without any objection to the financing contingency had GEA not received a better offer from Steadfast. The closing did not fail because of the contingency. Consequently, we conclude that the parties' subsequent conduct evinces the parties' intent to enter into the LPPA, rendering the contract definite and, therefore, enforceable.

¶ 32. GEA also asserts that the financing contingency clause is illusory for two reasons. First, the clause gives Metropolitan sole discretion to approve the financing, giving Metropolitan full control over determining whether the contingency has been met. Second, the clause gives Metropolitan exclusive authority to

waive the contingency, allowing Metropolitan to unilaterally create a binding contract where, according to GEA, no valid contract existed in the first place.

¶ 33. We agree with the court of appeals that the financing clause does not render the LPPA illusory. *Metropolitan Ventures,* 276 Wis. 2d 625, ¶ 20. A contract is illusory when the contract is "conditional on some fact or event that is wholly under the promisor's control and his [or her] bringing it about is left wholly to his [or her] own will and discretion . . . ." *Nodolf,* 103 Wis. 2d at 660 (citation and quotation omitted). While the financing clause at issue does not specify a particular term or rate of financing, it does set forth the percentage of the purchase price to be financed along with a practicable method in which the sale price would be determined.[11] *Metropolitan Ventures,* 276 Wis. 2d 625, ¶ 18. We agree that because of the fluidity involved in the sale of the business, financing terms could vary greatly over the 30 days specified in the contract, so that inserting a particular term or rate of financing would be speculative. *Id.,* ¶ 20. Here, the subsequent actions of *both* parties rendered the financing clause definite. Neither Metropolitan nor GEA had complete control over determining whether the financing contingency had been met: both parties came to the conclusion that Metropolitan had obtained sufficient financing. As such, we find that the financing contingency was not illusory.

IV

¶ 34. Under the terms of the contract, GEA was required, among other things, to use its best efforts

---

[11] Article II, section 2.1 a. of the LPPA.

1) to ensure GEA did not dispose of its assets to a third party; and 2) to obtain the assignments of GEA's limited partners. Metropolitan alleges that GEA breached its fiduciary duty, duty of good faith, and contractual obligations. Metropolitan also asserts that GEA intentionally interfered with the contractual relationship and intentionally, or at least negligently, made material misrepresentations to Metropolitan.

## A

¶ 35. Parties to a contract have a duty of good faith to each other. *Crown Life Ins. Co. v. LaBonte,* 111 Wis. 2d 26, 44, 330 N.W.2d 201 (1983) (citation omitted) (recognizing "the basic principle of contract law that the obligation of good faith is an implied condition in every contract"); *Ekstrom v. State,* 45 Wis. 2d 218, 222, 172 N.W.2d 660 (1969) (citation omitted) ("Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties.")(quotation omitted); *Chayka v. Santini,* 47 Wis. 2d 102, 108, 176 N.W.2d 561 (1970) ("The duty of good faith is an implied condition in every contract . . . "); *Foseid v. State Bank of Cross Plains,* 197 Wis. 2d 772, 796, 541 N.W.2d 203 (Ct. App. 1995) (citation omitted) ("[A] party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled."). *See also Market St. Assoc. Ltd. Partnership v. Frey,* 941 F.2d 588, 593 (7th Cir. 1991). In addition, when a contract requires that a party use its "best efforts" to fulfill its contractual obligations, the notion of "best efforts" incorporates the concept of good faith.

414

*See Western Geophysical Co. v. Bold Assoc.,* 584 F.2d 1164, 1171 (2nd Cir. 1978). As this court has previously stated:

> it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. . . . Moreover, there is an implied undertaking in every contract on the part of each party that he [or she] will not intentionally and purposely do anything to prevent the other party from carrying out his [or her] part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counter-promise against arbitrary or unreasonable conduct on the part of the promisee.

*Ekstrom,* 45 Wis. 2d at 222 (quotation and citations omitted).

■■■■■■

¶ 36. The duty of good faith arises because parties to a contract, once executed, have entered into a *cooperative relationship* and have abandoned the wariness that accompanied their contract negotiations, adopting some measure of trust of the other party. *Id.; See also Market Street,* 941 F.2d at 594–95. As the parties' performance in executing the contract increases, so too grows the "scope and bite of the good faith doctrine." *Id.,* at 595–96.

■■■■

¶ 37. In the present case, GEA and Metropolitan entered into a cooperative relationship when they agreed to the contract for the sale and purchase of the GEA partnership on March 19, 2002. Particular sections of the LPPA require GEA to use its "best efforts to ensure that the Partnership [did] not . . . [s]ell or dis-

pose of any asset,"[12] to use its "best efforts to keep the business of the Partnership intact,"[13] and to use its "reasonable best efforts to obtain Assignment Agreements from all the limited partners."[14] The contract's requirement that GEA use its "best efforts" explicitly imposes a duty of good faith on GEA to preserve the business for the sale to Metropolitan and to obtain the limited partners' consent to the sale. Having concluded that the LPPA was an enforceable contract, we conclude that Levins and GEA had a duty of good faith arise out of this contractual relationship with Metropolitan.

B

¶ 38. A central issue with regard to determining if GEA violated its duty of good faith is whether Levins attempted to intentionally mislead Metropolitan. Metropolitan alleges that Levins did intentionally mislead Metropolitan by continuing to actively pursue other sales, making efforts to dissuade GEA's limited partners from assigning their partnership interests in GEA, and misrepresenting her authority to act on behalf of GEA's limited partners. GEA contests these allegations.

¶ 39. We therefore examine whether Levins or GEA violated GEA's duty of good faith to Metropolitan with regard to the Steadfast offer of purchase, Levins' efforts to dissuade the limited partners from assigning their partnership interests in GEA, and Levins' representations regarding her authority to act on behalf of GEA's limited partners. We reiterate that this case

---

[12] Section 4.2.b.

[13] Section 4.3.

[14] Section 5.6.

arises out of a summary judgment motion by GEA and, therefore, "[a]ll reasonable inferences drawn from the underlying facts contained in these documents that are in the record must be viewed in the light most favorable to the non-moving party." *Johnson,* 283 Wis. 2d 384, ¶ 30, (citations omitted).

¶ 40. Metropolitan contends that on May 8, 2002, GEA received an offer from Steadfast for the purchase of the partnership and GEA, without notifying Metropolitan or GEA's limited partners of Steadfast's May 8 offer, negotiated terms and conditions of a sale to Steadfast. Moreover, on May 10, GEA countered Steadfast's May 8 offer without first notifying Metropolitan or GEA's limited partners of Steadfast's original May 8 offer.

¶ 41. Sections 4.2 and 4.3 of the LPPA required GEA to use its best efforts to ensure that GEA did not dispose of its assets to a third party and to ensure the business remained intact. Metropolitan asserts that GEA's failure to remove the property from the market and attempt to attract third-party offers to purchase the partnership violates these sections. However, GEA contests Metropolitan's assertion and argues that the Steadfast offer was entirely unsolicited. Moreover, GEA asserts that there was no "exclusive dealing" provision bargained for within the LPPA. GEA further counters that it did not violate its "best efforts" duties by entering into a secondary agreement with Steadfast that bound them only if and when the LPPA terminated.

¶ 42. In addition to the dispute over the Steadfast offer, Metropolitan asserts that Levins *actively dissuaded* GEA's limited partners from agreeing to sell GEA to Metropolitan, in direct violation of the terms of the LPPA. The LPPA required GEA to use its best efforts to encourage each of GEA's limited partners to assign to Metropolitan his or her partnership interests in GEA

and to attempt to obtain these assignments from at least two-thirds of GEA's limited partners. Although the parties agree that the limited partners were not obligated to sell their interests prior to signing the Assignment Agreements, the parties dispute whether the limited partners were obligated to sell their interests upon authorizing the sale by signing the Assignment Agreements. Metropolitan asserts the Assignment Agreements should have been held in escrow until closing under Section 1.1 of the LPPA. Metropolitan further asserts that GEA purposefully prevented the satisfaction of the two-thirds contingency and took advantage of GEA's self-caused failure in order to terminate the LPPA and pursue another sale. In contrast, GEA contends that Levins had no authority to deliver any of the Assignment Agreements prior to closing and that the limited partners were free to revoke their Assignment Agreements at any time prior to closing.

¶ 43. Finally, Metropolitan asserts that GEA intentionally, or at least negligently, made material misrepresentations to Metropolitan when GEA indicated it had authority to act on behalf of GEA's limited partners because Levins owed a duty to GEA's limited partners that conflicted with the terms and conditions of the LPPA.

¶ 44. GEA responds that Levins had a fiduciary duty to GEA's limited partners to inform them of the Steadfast offer and that Levins would have violated this duty had she not done so. Under Wis. Stat. § 178.18(1), the fiduciary obligations of a partner encompass the formation, conduct, and liquidation of the partnership. Wis. Stat. § 178.18(1). The statute states, in relevant part:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by

418

him or her without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him or her of partnership property.

Wis. Stat. § 178.18(1).

¶ 45. We conclude that genuine issues of material fact exist concerning GEA's good faith dealings with Metropolitan and its "best efforts" to ensure that it did not dispose of its assets or otherwise violate the terms and conditions of the LPPA prior to closing. Accordingly, we remand this matter to the circuit court to resolve these issues.

## V

¶ 46. This case involves questions about the definiteness of the financing contingency in a contract for the sale of GEA to Metropolitan, and whether Levins and GEA met their duty of good faith in executing the contract. We conclude that even though the financing contingency in the written contract was vague, the subsequent actions by both parties demonstrate that the parties mutually agreed to acceptable financing terms. We therefore conclude that the contract at issue is not too indefinite and is enforceable.

¶ 47. We also conclude that Levins owed a duty of good faith to Metropolitan, but that genuine issues of material fact exist concerning GEA's "best efforts" to ensure that it did not dispose of its assets and whether it violated its duty of good faith dealing with respect to the contract. We therefore affirm the decision of the court of appeals and remand this matter for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is affirmed, and this matter is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 48. JON P. WILCOX, J., took no part.

¶ 49. SHIRLEY S. ABRAHAMSON, C.J. *(concurring in part)* . I agree with the majority opinion that this matter must be remanded to the circuit court. I would, however, remand, in addition to the other issues, the factual question whether the parties mutually agreed to eliminate the illusory financing clause and proceed with the contract without a financing clause.

¶ 50. The circuit court properly concluded, I believe, that the financing clause rendered the contract illusory and void. The circuit court then concluded as a matter of law that the parties' communications were not sufficient to eliminate the financing clause or to constitute an agreement for a new contract with the same terms as the original "contract," except for the financing clause. Here's where I part with the circuit court. I think the intent of the parties is a matter of fact for the fact-finder, not for the circuit court on summary judgment.

¶ 51. The court of appeals concluded that the financing provision did not render the contract illusory and that there is a material issue of fact regarding whether the financing contingency was waived. Accordingly, it remanded the instant case to the circuit court for a determination of whether the buyer waived the financing clause.[1]

---

[1] *Metro. Ventures, LLC v. GEA Assocs.,* 2004 WI App 189, ¶¶ 23–29, 276 Wis. 2d 625, 688 N.W.2d 722.

¶ 52. In contrast, the majority opinion seems to conclude that the written agreement was indefinite and was made definite by the parties' subsequent conduct. The majority opinion concludes that "both parties came to the conclusion that Metropolitan had obtained sufficient financing."[2]

¶ 53. I conclude that the financing provision made the agreement illusory and that the record is insufficient to determine as a matter of law on summary judgment whether the parties formed a new contract (with the same terms as the original contract) by agreeing to eliminate the financing clause.

¶ 54. The majority opinion errs, I think, by conflating the question whether the contract is illusory with the question whether the contract is indefinite. Although the concepts of illusoriness and indefiniteness may overlap and Wisconsin case law sometimes uses the words confusedly, they should be analyzed separately.[3]

¶ 55. A promise is illusory if "[w]ords of [the] promise [] by their terms make performance entirely optional with the 'promisor.' "[4] The Wisconsin case lawis in accord.[5]

---

[2] Majority op., ¶ 33.

[3] Professor Farnsworth analyzes *Gerruth Realty Co. v. Pire,* 17 Wis. 2d 89, 95, 115 N.W.2d 557 (1962), to say that the buyer's promise to obtain financing was so indefinite that it was illusory. *See* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 2.13 n.13 (3d ed. 2004).

[4] Restatement (Second) of Contracts § 77 cmt. a. (1981). *See also* 1 Farnsworth, *supra* note 3, § 2.13; 2 Joseph M. Perillo, *Corbin on Contracts* § 5.28 (1995).

[5] *Krause v. Holand,* 33 Wis. 2d 211, 217, 147 N.W.2d 333 (1967) (agreement "subject to securing a loan by 8/31/64" was illusory) (citing *Gerruth Realty,* 17 Wis. 2d at 95).

¶ 56. The court of appeals in *Nodolf v. Nelson*, 103 Wis. 2d 656, 660, 309 N.W.2d 397 (Ct. App. 1981) (quoting 1 *Corbin on Contracts* § 149, at 656–59 (2d ed. 1963), observed that a contract is illusory when the contract is conditioned on a fact or event wholly under the control of one party: "[P]romissory words are illusory if they are in form a promise that is conditional on some fact or event that is wholly under the promisor's control and his bringing it about is left wholly to his own will and discretion."[6] A putative contract that is illusory is no contract at all, that is, such a contract is void.[7]

¶ 57. As the court of appeals further explained in *Nodolf,* a financing contingency renders the contract incurably illusory and unenforceable if the contingency grants to one party the exclusive right to determine whether suitable financing has been obtained: "The buyer cannot have the exclusive right to determine whether financing has been obtained without rendering illusory his promise to purchase. The fact that he chose to fulfill the financing condition therefore does not cure the unenforceability of the agreement."[8]

¶ 58. The financing condition at issue in the present case states as follows:

---

[6] Illusory contracts are not contracts because the illusory language "makes performance optional with the promisor no matter what may happen, or no matter what course of conduct in other respects the promisor may pursue[;] it does not justify the promisee in understanding that a commitment has been made." 1 Richard A. Lord, *Williston on Contracts* § 1.2, at 11 (4th ed. 1990).

[7] *First Wis. Nat'l Bank of Milwaukee v. Oby,* 52 Wis. 2d 1, 7–8, 188 N.W.2d 454 (1971).

[8] *See also Gerruth Realty,* 17 Wis. 2d at 92 (contract provision that "allows one party to a contract to determine

5.7 Financing Contingency. Buyer shall have obtained unconditional financing in an amount equal to 85% of the purchase price from a reputable Lender *on terms satisfactory to Buyer* and an appraisal which is satisfactory to Buyer *in Buyer's sole discretion.* Unless Buyer waives this contingency by written notice to Seller within 30 days following full execution of this Agreement, this Agreement shall terminate without further force or effect and Buyer's earnest money shall be promptly returned.

(Emphasis added.)

¶ 59. I agree with the circuit court that the financing provision in the instant case is illusory. Absent construing the contract to require good faith relating to financing (and the circuit court explicitly concluded that the financing provision did not include a good faith requirement),[9] the contract is plainly illusory because the buyer retains sole discretion about the sufficiency of financing.[10] Thus, the putative contract in the instant case was void at the time of formation. Only a new contract will save a void agreement between the buyer and seller.

---

without limitation and in a subjective manner the meaning of an ambiguous term, comes dangerously close to an illusory or aleatory contract").

[9] Professor Farnsworth writes that "[c]ourts have responded to facially insubstantial promises in two diametrically opposite ways." One way is to declare the contract void as illusory. A second and more recent way is to read the apparently illusory promise so that it is not illusory; courts read the promise as a promise to act in good faith in exercising judgment. 1 Farnsworth, *supra* note 3, § 2.13 at 133–38. *See also* 2 Perillo, *supra* note 4, § 5.28 at 148 (same).

[10] *Nodolf v. Nelson,* 103 Wis. 2d 656, 660, 309 N.W.2d 397 (Ct. App. 1981).

¶ 60. The majority opinion dismisses the claim that the contract is illusory, concluding that "the subsequent actions of both parties rendered the financing clause definite. Neither Metropolitan nor GEA had complete control over determining whether the financing contingency had been met: both parties came to the conclusion that Metropolitan had obtained sufficient financing."[11]

¶ 61. I agree with the majority opinion that an indefinite contract may be made definite. A contract provision is indefinite (or uncertain) if the provisions in the contract do not "provide a basis for determining the existence of breach and for giving an appropriate remedy."[12] This court has held that if a contract cannot be given sufficient definiteness, the contract will not be enforced.[13]

¶ 62. A contract that appears indefinite on its face may be made definite by trade usage of the terms in the contract or the course of dealing between the parties.[14] The majority opinion concludes the subsequent actions of both parties rendered this contract definite. But if the contract was illusory when made, it cannot be cured by the subsequent conduct.

¶ 63. Because I conclude that the financing clause renders the contract illusory and void, I would remand the matter to the circuit court for further proceedings

---

[11] Majority op., ¶ 33 (emphasis removed).

[12] Restatement (Second) of Contracts § 33(2) (1981) (restatement provision regarding "certainty"); 1 Farnsworth, *supra* note 3, §§ 3.1, 3.29; 1 Perillo, *supra* note 4, § 4.1. For further discussion of indefiniteness in Wisconsin case law, see *Mgmt. Computer Servs. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 178–80, 557 N.W.2d 67 (1996).

[13] *Mgmt. Computer Servs.,* 206 Wis. 2d at 178–80.

[14] Restatement (Second) of Contracts § 33 cmt. *a* (1981).

to determine whether the parties formed a new contract without a financing term.

¶ 64. I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this opinion.